**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

——————————————————————

|                                               |     |                                   |
|-----------------------------------------------|-----|-----------------------------------|
| CAUSE OF ACTION INSTITUTE,                    | )   |                                   |
|                                               | )   |                                   |
|              Plaintiff,                       | )   |                                   |
|                                               | )   |                                   |
|       v.                                      | )   | Civil Action No. 20-0997 (BAH)    |
|                                               | )   |                                   |
| U.S. DEPARTMENT OF VETERANS AFFAIRS,          | )   |                                   |
|                                               | )   |                                   |
|              Defendant.                       | )   |                                   |

——————————————————————

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Ryan P. Mulvey
(D.C. Bar No. 1024362)

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Telephone: (571) 482-4182
ryan.mulvey@causeofaction.org

*Counsel for Plaintiff CoA Institute*

# TABLE OF CONTENTS

Table of Authorities .................................................................................................... iii

Introduction ................................................................................................................. 1

Factual and Procedural Background .......................................................................... 1

   I.    Defendant's "National Realignment Strategy" and Pilot Studies ...................... 1

   II.   CoA Institute's FOIA Request ........................................................................ 4

   III.  Procedural History ........................................................................................ 4

Standard of Review ..................................................................................................... 5

Argument ..................................................................................................................... 6

   I.    Defendant cannot rely on Exemption 5 and the deliberative-process privilege. ............... 8

   II.   Defendant cannot rely on Exemption 6. .......................................................... 11

       A.   Employee Names and Employee Titles ................................................ 12

       B.   Provider Productivity Data ................................................................. 16

       C.   Aggregate Patient Level Data ............................................................ 17

   III.  Defendant has not satisfied its burden under the "foreseeable harm" standard ............... 18

   IV.  Defendant did not segregate and release non-exempt portions of responsive records. .... 21

   V.   *In camera* review of the records at issue would be appropriate. ..................... 23

Conclusion ................................................................................................................. 25

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Aguirre v. Securities & Exchange Commission,*
    551 F. Supp. 2d 33 (D.D.C. 2008) ................................................................................16

*American Civil Liberties Union v. Department of Justice,*
    655 F.3d 1 (D.C. Cir. 2011) ........................................................................................15

*American Federation of Government Employees, Local 812 v.*
    *Broadcasting Board of Governors,*
    711 F. Supp. 2d 139 (D.D.C. 2010) ............................................................................15

*Ancient Coin Collectors Guild v. Department of State,*
    641 F.3d 504 (D.C. Cir. 2011) ......................................................................................8

*Assassination Archives & Research Center v. Central Intelligence Agency,*
    334 F.3d 55 (D.C. Cir. 2003) ......................................................................................12

*Canaday v. U.S. Citizenship & Immigration Services,*
    545 F. Supp. 2d 113 (D.D.C. 2008) ............................................................................15

*Carter v. Department of Commerce,*
    830 F.2d 388 (D.C. Cir. 1987) ....................................................................................25

*Center for Investigative Reporting v. U.S. Customs & Border Protection,*
    436 F. Supp. 3d 90 (D.D.C. 2019) ..............................................................................21

*Clemmons v. U.S. Army Crime Records Center,*
    No. 05-02353, 2007 WL 1020827 (D.D.C. Mar. 30, 2007) ........................................14

*Coastal States Gas Corp. v. Department of Energy,*
    617 F.2d 854 (D.C. Cir. 1980) ............................................................................9, 10, 11

*Competitive Enterprise Institute v. Environmental Protection Agency,*
    232 F. Supp. 3d 172 (D.D.C. 2017) ..............................................................................6

*Defenders of Wildlife v. U.S. Border Patrol,*
    623 F. Supp. 2d 83 (D.D.C. 2009) ................................................................................6

*Department of the Interior v. Klamath Water Users Protective Ass'n,*
    532 U.S. 1 (2001) ....................................................................................................8, 18

*Department of Justice v. Tax Analysts,*
    492 U.S. 136 (1989) ......................................................................................................6

*Department of State v. Washington Post Co.*,
    456 U.S. 595 (1982)........................................................................................12, 16, 17

*Edmonds Institute v. Department of the Interior*,
    383 F. Supp. 2d 105 (D.D.C. 2005) ..............................................................22

*Environmental Protection Agency v. Mink*,
    410 U.S. 73 (1973)..........................................................................................22

*Forest Service Employees for Environmental Ethics v. U.S. Forest Service*,
    524 F.3d 1021 (9th Cir. 2008) ......................................................................14

*Government Accountability Project v. Department of State*,
    699 F. Supp. 2d 97 (D.D.C. 2010) ................................................................15

*Horowitz v. Peace Corps*,
    428 F.3d 271 (D.C. Cir. 2005) ......................................................................12

*Huffman v. Western Nuclear, Inc.*,
    486 U.S. 663 (1988)..........................................................................................6

*Hunton & Williams LLP v. Environmental Protection Agency*,
    248 F. Supp. 3d 220 (D.D.C. 2017) ..............................................................14

*Ibrahim v. Department of State*,
    311 F. Supp. 3d 134 (D.D.C. 2018) ..............................................................19

*Iglesias v. Central Intelligence Agency*,
    525 F. Supp. 547 (D.D.C. 1981) ....................................................................14

*In Defense of Animals v. National Institutes of Health*,
    543 F. Supp. 2d 70 (D.D.C. 2008) ..........................................................16, 17

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989)..........................................................................................5

*Judicial Watch, Inc. v. Department of Commerce*,
    375 F. Supp. 3d 93 (D.D.C. 2019) ................................................................19

*Judicial Watch, Inc. v. Department of Justice*,
    No. 17-0832, 2019 WL 4644029 (D.D.C. Sept. 24, 2019)............................21

*Judicial Watch, Inc. v. Department of the Treasury*,
    796 F. Supp. 2d 13 (D.D.C. 2011) ................................................................23

*Judicial Watch, Inc. v. Food & Drug Administration*,
    449 F.3d 141 (D.C. Cir. 2006) ......................................................................12

*Kleinert v. Bureau of Land Management,*
  132 F. Supp. 3d 79 (D.D.C. 2015) ......................................................................13

*Krikorian v. Department of State,*
  984 F.2d 461 (D.C. Cir. 1993) ............................................................................22

*Long v. Immigration & Customs Enforcement,*
  279 F. Supp. 3d 226 (D.D.C. 2017) ....................................................................14

*Long v. Office of Personnel Management,*
  692 F.3d 185 (2d Cir. 2012) ...............................................................................14

*Loving v. Department of Defense,*
  550 F.3d 32 (D.C. Cir. 2008) ..............................................................................24

*Machado Amadis v. Department of State,*
  971 F.3d 364, 371 (D.C. Cir. 2020) ....................................................................19

*Mapother v. Department of Justice,*
  3 F.3d 1533 (D.C. Cir. 1993) ................................................................................8

*Military Audit Project v. Casey,*
  656 F.2d 724 (D.C. Cir. 1981) ...............................................................................6

*Morley v. Central Intelligence Agency,*
  508 F.3d 1108 (D.C. Cir. 2007) ..........................................................................13

*Multi Ag Media LLC v. Department of Agriculture,*
  515 F.3d 1224 (D.C. Cir. 2008) .............................................................................6

*National Archives & Records Administration v. Favish,*
  541 U.S. 157 (2004) ......................................................................................5, 23

*National Labor Relations Board v. Robbins Tire & Rubber Co.,*
  437 U.S. 214 (1989) ..............................................................................................5

*National Labor Relations Board v. Sears, Roebuck & Co.,*
  421 U.S. 132 (1975) ..............................................................................................8

*National Security Archive Fund, Inc. v. Central Intelligence Agency,*
  402 F. Supp. 2d 211 (D.D.C. 2005) ....................................................................23

*National Security News Service v. Department of the Navy,*
  584 F. Supp. 2d 94 (D.D.C. 2008) ......................................................................18

*New York Times Co. v. National Aeronautics & Space Administration,*
  852 F.2d 602 (D.C. Cir. 1988) ............................................................................17

*People for the American Way Foundation v. National Park Service,*
   503 F. Supp. 2d 284 (D.D.C. 2007) ........................................................................9, 24

*Pinson v. Department of Justice,*
   177 F. Supp. 3d 56 (D.D.C. 2016) .................................................................................13

*Public Citizen, Inc. v. Office of Management & Budget,*
   598 F.3d 865 (D.C. Cir. 2010) ................................................................................9, 11

*Public Employees for Environmental Responsibility v. Department of the Interior,*
   No. 06-182, 2006 WL 3422484 (D.D.C. Nov. 28, 2006) ..............................................18

*Quick v. Department of Commerce,*
   775 F. Supp. 2d 174 (D.D.C. 2011) ...............................................................................5

*Quiñon v. Federal Bureau of Investigation,*
   86 F.3d 1222 (D.C. Cir. 1996) .....................................................................................24

*Rosenberg v. Department of Defense,*
   342 F. Supp. 3d 62 (D.D.C. 2018) ................................................................................19

*Ryan v. Department of Justice,*
   617 F.2d 781 (D.C. Cir. 1980) ...............................................................................8, 22

*Sai v. Transportation Security Administration,*
   315 F. Supp. 3d 218 (D.D.C. 2018) ..............................................................................13

*Schoenman v. Federal Bureau of Investigation,*
   575 F. Supp. 2d 136 (D.D.C. 2008) ...............................................................................6

*Spirko v. U.S. Postal Service,*
   147 F.3d 992 (D.C. Cir. 1998) .....................................................................................24

*Stern v. Federal Bureau of Investigation,*
   737 F.2d 84 (D.C. Cir. 1984) .......................................................................................14

*Stonehill v. Internal Revenue Service,*
   534 F. Supp. 2d 1 (D.D.C. 2008) ..................................................................................13

*Trans-Pacific Policing Agreement v. U.S. Customs Service,*
   177 F.3d 1022 (D.C. Cir. 1999) ...................................................................................22

*United America Financial, Inc. v. Potter,*
   531 F. Supp. 2d 29 (D.D.C. 2008) ................................................................................13

*United States v. Weber Aircraft Corporation,*
   465 U.S. 792 (1984) ........................................................................................................8

*Vaughn v. Rosen*,
    523 F.2d 1136 (D.C. Cir. 1975) ..............................................................................8, 11

**Statutes**

5 U.S.C. § 552(a)(4)(A)(viii)(I) ....................................................................................5

5 U.S.C. § 552(a)(4)(B) ............................................................................................6, 24

5 U.S.C. § 552(a)(8)(A)(i)(I) ......................................................................................18

5 U.S.C. § 552(a)(8)(A)(i)(II) ....................................................................................21

5 U.S.C. § 552(b) .......................................................................................................21

5 U.S.C. § 552(b)(5) ....................................................................................................8

5 U.S.C. § 552(b)(6) ..............................................................................................7, 11

Consolidated & Further Continuing Appropriations, 2015,
    Pub. L. No. 113-235, 128 Stat. 2130 (2014) .............................................................2

Consolidated Appropriations Act, 2018,
    Pub. L. No. 115-141, 132 Stat. 348 (2018) ...............................................................2

VA MISSION Act of 2018,
    Pub. L. No. 115-182,  132 Stat. 1393 (2018) ...................................................3, 4, 20

**Rules**

Federal Rule of Civil Procedure 56(a) ..........................................................................6

**Other Authorities**

162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016) .........................................................18

Kellie Lunney, *VA Secretary Touts Largest Reorganization in Department's
    History*, Gov't Exec., Nov. 10, 2014, http://bit.ly/37jfVmL ....................................2

Kelly Lunney, *VA Announces Major Department Realignment*, Gov't Exec., Jan.
    26, 2015, http://bit.ly/3q8KT8t ...............................................................................2

## INTRODUCTION

This case concerns a Freedom of Information Act ("FOIA") request seeking records related to efforts undertaken by Defendant Department of Veterans Affairs ("VA") to reform and "realign" its delivery of healthcare services to American veterans.  Specifically, the records at issue include "pilot study" market assessments, and related briefing documents, prepared by a non-governmental contractor.  Defendant has withheld these responsive records nearly in full under Exemption 5, in conjunction with the deliberative-process privilege, and Exemption 6.  But Defendant has not met its burden in demonstrating that either of these exemptions applies.  The pilot studies are neither predecisional nor deliberative, and the asserted privacy interests under Exemption 6 are either insubstantial or not even cognizable as belonging to an individual.  In any case, the public interest outweighs any potential impact on personal privacy.  Defendant also has failed to satisfy the FOIA's "foreseeable harm" standard and has not provided adequate evidence to conclude that it undertook reasonable efforts to segregate non-exempt content from the hundreds of pages withheld in full.  Plaintiff Cause of Action Institute ("CoA Institute") respectfully requests the Court to deny Defendant's motion for summary judgment and grant CoA Institute's cross-motion.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Defendant's "National Realignment Strategy" and Pilot Studies

Defendant is responsible, by and through the Veterans Health Administration ("VHA"), for maintaining a nation-wide system of healthcare facilities that provide medical services to American veterans.  "There are approximately 140 [VA] Medical Centers and nearly 1700 outpatient centers" around the country.  Decl. of Christine M. Stuppy, MBA ⁋ 4, ECF No. 16-3. These facilities are "organized into geographic regions known as Veterans Integrated Service Networks (VISNs)," and "[t]here are 18 VISNs that serve 96 geographic markets."  Stuppy Decl.

¶ 4.  In the wake of numerous scandals throughout 2014, Defendant announced plans to restructure the VHA, and the operation of its healthcare facilities.  *See, e.g.*, Kellie Lunney, *VA Secretary Touts Largest Reorganization in Department's History*, Gov't Exec., Nov. 10, 2014, http://bit.ly/37jfVmL; *see generally* Kelly Lunney, *VA Announces Major Department Realignment*, Gov't Exec., Jan. 26, 2015, http://bit.ly/3q8KT8t.

In response to Defendant's planned restructuring, Congress mandated the VA first prepare a "national realignment strategy" and submit a comprehensive report of its plans for each VISN. *See* Stuppy Decl. ¶ 5.  Among other things, Congress directed Defendant to consider a "Long Range Capital Plan," to explain the development and coordination of potential reforms, and to prepare "cost vs. benefit analysis of each planned realignment, including the cost of replacing [VHA] services with contract care or other outsourced services[.]"  Consolidated & Further Continuing Appropriations, 2015, Pub. L. No. 113-235, § 235, 128 Stat. 2130, 2566–67 (2014). Congress reiterated Defendant's reporting obligations in subsequent years.  *See, e.g.*, Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 233, 132 Stat. 348, 819–20 (2018).

Defendant set out to prepare its national realignment strategy by initiating a "Market Area Health System Optimization (MAHSO) analysis."  Stuppy Decl. ¶ 5 ("The outcomes of the MAHSO work will determine what services and capital are necessary for a high performing network, and those identified capital elements will be part of the National Realignment Strategy."). Defendant contracted with PricewaterhouseCoopers to develop a "uniform methodology to perform market assessments" across the VHA's ninety-six geographic markets as part of the MAHSO process.  Stuppy Decl. ¶ 6.  This "uniform methodology" was refined by conducting pilot studies in "three diverse markets."  Stuppy Decl. ¶¶ 6 & 8.  PricewaterhouseCoopers completed

2

the three pilot studies in early 2017. Stuppy Decl. ¶ 7. These finalized studies, and accompanying briefing documents, are the records at issue in this case.

It is vital to understand the precise role of the pilot studies in Defendant's broader effort to conduct assessments across its ninety-six geographic markets. The contracted pilot studies were not supposed to be "used for any purpose other than to evaluate the market assessment methodology and to determine which deliverables might be of interest to senior [VA] leaders." Stuppy Decl. ¶ 6. In other words, "[t]he purpose of the pilot market assessments . . . was *solely to test and refine the market assessment methodology* for performing comprehensive market assessment reviews" in the future across the entire VA system. Stuppy Decl. ¶ 7. Indeed, the "recommendations" provided by PricewaterhouseCoopers to Defendant at the completion of the pilot studies "were not intended to be acted upon" at all but were merely offered to test the "appetite for the types of [reform] ideas the pilot study data supported." Stuppy Decl. ¶ 9. Subsequent market assessments—including those that have been (or are still being) conducted in the three markets targeted for the pilot program—are ongoing and distinct. *See* Stuppy Decl. ¶ 10. These assessments—as opposed to the pilot studies—provide the "data" with which Defendant will design its national realignment strategy.

The nature of the pilot studies, and their ostensible role in agency policy development, should also be understood in light of the VA MISSION Act of 2018, which effectively superseded Congress's prior directive that Defendant prepare a national realignment plan before undertaking planned reforms *on its own initiative*. The MISSION Act removed final decisional authority from Defendant over any realignment efforts. The law instead requires Defendant to prepare proposed criteria for devising recommendations for VHA reform, to open those proposed criteria to public comment, and thereafter to submit the criteria to Congress. Pub. L. No. 115-182,

3

§ 203(a), 132 Stat. 1393, 1446 (2018).   Based on the finalized criteria, Defendant is expected to prepare draft recommendations for VHA modernization, *see id.* at § 203(b)(1)–(2), 132 Stat. at 1446–47, taking into account the results of its ongoing market assessments (but *not* the pilot studies).  *See id.* at § 203(b)(3), 132 Stat. at 1447–48; *see also* Stuppy Decl. ⁋ 10 ("The draft market assessments and National Realignment Strategy are required to be submitted to the AIR Commission in 2022; they will be provided to Congress at the same time.").   Final action is then left to the Asset and Infrastructure Review Commission and, ultimately, the President.  *See* Pub. L. No. 115-182, §§ 203(d), 204(a), 132 Stat. at 1449–50; *see also* Stuppy Decl. ⁋ 10.[1]

## II.   CoA Institute's FOIA Request

In January 2019, CoA Institute submitted a FOIA request to Defendant seeking access to records related to the contracted pilot market assessments, including all "'email communications and reports . . . relating to . . . VA Contract No. VA101F-17-C-2843[.]'"   Pl.'s Statement of Undisputed Material Facts ⁋ 1 [hereinafter "Pl.'s SUMF"]; *see* Pl.'s SUMF ⁋ 2.  CoA Institute requested a public interest fee waiver and classification as a "representative of the news media" for fee purposes.  Pl.'s SUMF ⁋ 5.  Defendant acknowledged its receipt of the FOIA request and assigned it tracking number 19-03374-F.  Pl.'s SUMF ⁋ 6.  The agency subsequently reassigned CoA Institute's FOIA request tracking number 19-05023-F.  Pl.'s SUMF ⁋ 7.  Defendant failed to provide a timely response to the request before CoA Institute filed this lawsuit.

## III.   Procedural History

CoA Institute filed the present action in April 2020.  Pl.'s SUMF ⁋ 8.  Defendant filed its Answer the next month.  Pl.'s SUMF ⁋ 9.  Defendant issued a series of partial "Initial Agency

---

[1]  The MISSION Act also provides a mechanism for congressional disapproval of any finalized presidential recommendation for VHA realignment.  Pub. L. No. 115-182, § 204(b), 132 Stat. at 1450–51.

Decisions," identifying various responsive records that it withheld in part or in full. Pl.'s SUMF ¶¶ 10–12, 15–16. Defendant completed production in September 2020, and the parties narrowed the scope of issues they intended to litigate.[2] Plaintiff challenges the treatment of those records identified in Defendant's May 2020 release, namely, the three pilot studies and briefing documents. *See* Pl.'s SUMF ¶ 17. Prior to filing its motion for summary judgment, Defendant reprocessed the records at issue and released thirty-eight pages in full or in part. Pl.'s SUMF ¶ 18. Defendant's treatment of the remaining pages remains unchanged. Pl.'s SUMF ¶ 18.

## STANDARD OF REVIEW

"Congress enacted the FOIA to introduce transparency into government activities." *Quick v. Dep't of Commerce*, 775 F. Supp. 2d 174, 179 (D.D.C. 2011) (citing *Stern v. Fed. Bureau of Investigation*, 737 F.2d 84, 88 (D.C. Cir. 1984)). The statute serves as a "means for citizens to know what the Government is up to" and it "defines a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (citation and internal quotation marks omitted). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1989). The rights afforded under the FOIA are a bulwark to the "fundamental principle of public access" to records of the administrative state, which can often be "shielded unnecessarily from public view . . . [by] possibly unwilling official hands." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989) (cleaned up and citation omitted).

---

[2] Defendant denied CoA Institute's fee category request, Pl.'s SUMF ¶ 13, and failed to issue a determination on the request for a public-interest fee waiver. Pl.'s SUMF ¶ 14. Defendant considers the fee issue "moot" because there are no "duplication costs." Pl.'s SUMF ¶ 14. If CoA Institute prevails, and Defendant is ordered to reprocess the records at issue, CoA Institute reserves the right to challenge the agency's failure to adjudicate its fee waiver request. Defendant is statutorily barred from attempting to impose search fees because it failed to issue a timely determination on CoA Institute's FOIA request. *See* 5 U.S.C. § 552(a)(4)(A)(viii)(I).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). In a FOIA case, "the burden is on the agency to sustain its action[.]" 5 U.S.C. § 552(a)(4)(B); *cf. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989). The district court determines *de novo* "'whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure[.]'" *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation omitted).

An agency may meet its burden on summary judgment by proffering affidavits that "describe the documents and the justifications for nondisclosure with reasonably specific detail" that is "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). The agency "must show that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed[.]" *Competitive Enter. Inst. v. Envtl. Prot. Agency*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017). Courts should analyze "all underlying facts and inferences . . . in the light most favorable to the FOIA requester." *Schoenman v. Fed. Bureau of Investigation*, 575 F. Supp. 2d 136, 148 (D.D.C. 2008) (citation omitted). If both parties seek summary judgment, each motion must stand on its own. *See Huffman v. W. Nuclear, Inc.*, 486 U.S. 663, 664 n.11 (1988).

## ARGUMENT

Defendant argues the pilot studies and related briefing documents are protected by Exemption 5 and the deliberative-process privilege. *See* Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. at 8–13 [hereinafter "Def.'s Mot."], ECF No. 16-1. It also argues portions of

those records are protected by Exemption 6.  *See id.* at 13–17.  Finally, Defendant argues it has disclosed all reasonably segregable portions of the records.  On each count, the agency is mistaken.

*First*, the pilot market assessments cannot be protected by the deliberative-process privilege because they are neither predecisional nor deliberative.  As Defendant's own declarant explains, the pilot studies were only "used to inform VA's needs in conducting the enterprise-wide market studies that are currently ongoing."  Stuppy Decl. ⁋ 10.  They were never intended to be used for deliberative policymaking within the VA.  *See* Stuppy Decl. ⁋⁋ 6–7.  Defendant point-blankly concedes that the "recommendations" from PricewaterhouseCoopers "were not intended to be acted upon[.]"  Stuppy Decl. ⁋ 9.  The non-deliberative aspect of the pilot studies is further confirmed by the overall realignment process described by Congress in the MISSION Act.

*Second*, the portions of records withheld under Exemption 6—namely, "employee names, employee titles, provider productivity data, and aggregate patient level data," Decl. of Barbara Swailes ⁋ 22, ECF No. 16-2—either fail to meet the exemption's threshold requirement of constituting either "personnel and medical files [or] similar files," 5 U.S.C. § 552(b)(6), or they do not implicate a substantial individual privacy interest.  In any case, the public interest in disclosure overrides any purported privacy interests.

*Finally*, Defendant has failed to satisfy its burden under the "foreseeable harm" standard and to demonstrate that it conducted an adequate segregability review.  The Court should therefore deny Defendant's motion for summary judgment, grant CoA Institute's cross-motion, and order Defendant to produce the records at issue in their entirety within twenty days.[3]

---

[3] Defendant offers a lengthy argument for the adequacy of its search for responsive records.  *See* Def.'s Mot. at 5–8.  But the sufficiency of Defendant's search is not in dispute.  The parties agreed to narrow the scope of summary judgment to the treatment of responsive records released as part of Defendant's first production—*i.e.*, the three pilot studies and accompanying briefing documents.  Pl.'s SUMF ⁋ 17.

## I.  Defendant cannot rely on Exemption 5 and the deliberative-process privilege.

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  The Supreme Court has construed Exemption 5 to cover "those documents, and only those documents that are normally privileged in the civil discovery context." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) (footnote omitted); *see Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) [hereinafter "*Klamath*"].  Exemption 5 encompasses various statutory and common law privileges. *See United States v. Weber Aircraft Corp.*, 465 U.S. 792, 800–01 (1984).  One of the most invoked—which is relevant here—is the deliberative-process privilege.  *See Sears, Roebuck & Co.*, 421 U.S. at 149–50.[4]

To withhold a record under the deliberative-process privilege, an agency must demonstrate that the record is "both predecisional and deliberative." *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993).  A record is "predecisional" when it is generated "'[a]ntecedent to the adoption of an agency policy.'" *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (citation omitted).  It is "deliberative" when it forms "a direct part of the deliberative process in that it makes recommendations or expresses opinion on legal or policy matters," *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975), thus reflecting the "give-and-

---

[4] As a threshold matter, an agency invoking Exemption 5 must demonstrate that a record is an "inter-agency or intra-agency memorandum[] or letter."  5 U.S.C. § 552(b)(5).  The D.C. Circuit has long embraced a broad, atextual interpretation of this requirement, which permits agencies to withhold records "solicited by [an] agency" but created by an "outside consultant." *Ryan v. Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980).  The Supreme Court, for its part, has sought to moderate use of the so-called "consultant corollary" by stressing the "independent vitality" of Exemption 5's threshold requirement. *Klamath*, 532 U.S. at 12.  An agency must show how outside experts "play[] essentially the same part in an agency's process of deliberation" as agency employees. *Id.* at 10.  In other words, a "consultant" is expected to "function[] just as an employee." *Id.* at 11.  Here, CoA Institute does not challenge whether Defendant has technically satisfied Exemption 5's threshold requirement.  CoA Institute rather objects to the foundational confusion and lack of textual support undergirding the D.C. Circuit's prevailing precedent, and the obvious inconsistency of the consultant corollary with the plain meaning of Exemption 5's unambiguous language.

take of the consultative process" typical of agency decision-making. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980). If records "neither make recommendations for policy change nor reflect internal deliberations on the advisability of any particular course of action, they are not predecisional and deliberative[.]" *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 875 (D.C. Cir. 2010). The "key question" is "whether disclosure would tend to diminish candor within an agency." *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 298 (D.D.C. 2007).

Here, Defendant's reliance on the deliberative-process privilege must fail. The agency claims the pilot studies "form part of the foundation for VA to create its National Realignment Strategy." Def.'s Mot. at 11. This is misleading. Defendant concedes the pilots were only undertaken to evaluate a uniform methodology for subsequent nation-wide assessments of the VA's ninety-six geographic markets. Stuppy Decl. ⁋ 6 ("The pilot market assessment outputs were not used for any purpose other than to evaluate the market assessment methodology and to determine which deliverable might be of interest to senior leaders."). Indeed, "[t]he purpose of the pilot market assessments . . . was *solely to test and refine the market assessment methodology* for performing comprehensive market assessment reviews of the [entire VHA] enterprise." Stuppy Decl. ⁋ 7. The pilot process is entirely divorced from Defendant's broader effort to design a national realignment strategy and criteria for future recommendations to the Asset and Infrastructure Review Commission and the President. *See supra* at pp. 3–4 (describing impact of the MISSION Act of 2018; *see also* Stuppy Decl. ⁋ 13 ("[T]he final output of the pilots was a methodology and not intended to be opportunities for implementation[.]"). In this sense, the pilot studies cannot be *predecisional* because they only reflect the consummation of the design of the uniform methodology.

Defendant nevertheless insists the pilot studies "were generated before the adoption of agency policy," and "[n]o decision regarding the result of the market assessments for the National Realignment Study has been made."  Swailes Decl. ⁋ 18.  But *that* decision does not take into account the results of the pilot studies.  *See* Stuppy Decl. ⁋ 6; *see also* Stuppy Decl. ⁋ 10 ("The pilot market assessments were used to inform VA's needs in conducting the enterprise-wide market studies that are currently ongoing."); *see generally supra* at pp. 3–4 (describing the impact of the MISSION Act of 2018).  Any supposed distinction between the pilot studies being "complete" but not "final" is mere sleight of hand.  Def.'s Mot. at 11.

It is well-established that, "even if [a] document is predecisional at the time it is prepared, it can lose that status, if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public."  *Coastal State Gas Corp.*, 617 F.2d at 866.  PricewaterhouseCoopers finalized the pilot studies five years ago, when Defendant finalized its uniform methodology.  *See, e.g.*, Stuppy Decl. ⁋ 6.  Disclosure of the pilot studies could not reveal how the uniform methodology was subsequently applied, and it will not reveal any results of the recent market assessments undertaken in all ninety-six VA geographic markets.  Defendant's protest that the pilot studies are "not even the final market assessments of those VISNs" is thus without moment.  Def.'s Mot. at 12.  The pilot studies were never intended to be the market assessments considered as part of the VA's efforts to design realignment criteria.[5]  They are *final*

---

[5] One of Defendant's declarants claims "[t]he information used and analyzed in conducting the pilot assessment is/will be used in the larger 96-market assessment project and is inextricably intertwined with the ongoing market assessments."  Swailes Decl. ⁋ 18; *see* Def.'s Mot. at 12–13.  Yet Defendant's other declarant offers contradictory testimony, which indicates the *only* aspect of the pilot studies imported into the subsequent nation-wide assessments is the uniform "methodology."  Stuppy Decl. ⁋⁋ 6–7.  Defendant offers no other factual basis for the notion that the pilot studies are "inextricably intertwined," in any meaningful way, with the ongoing market assessments.

*work product*, delivered to Defendant by its contractor, which concern the methodology adopted for the nation-wide market assessment process.[6]

The pilot studies also cannot be "deliberative" because they do not "make recommendations or express opinion on legal or policy matters." *Vaughn*, 523 F. 2d at 1144. They do not reflect the "give-and-take of the consultative process." *Coastal States Gas Corp.*, 617 F.2d at 867. Defendant admits as much: "The outcomes of the pilot studies, in the form of opportunities or recommendations . . . *were not intended to be acted upon*[.]" Def.'s Mot. at 11–12 (emphasis added); *see* Stuppy Decl. ▐ 9. Unlike the "enterprise-wide market studies that are currently ongoing," Stuppy Decl. ▐ 10, the pilot studies, and related briefing documents, do not reflect "internal deliberations on the advisability of any particular course of action," *Pub. Citizen, Inc.*, 598 F.3d at 875, such as finalizing realignment criteria or other recommendations for public comment and congressional or presidential consideration. *See* Stuppy Decl. ▐ 10.

Defendant likely possesses records related to its ongoing market assessments and realignment strategy that could be protected by Exemption 5. But the pilot studies and briefing documents, which predate Defendant's nation-wide assessments and play no other role in developing external criteria or recommendations for VA realignment, are not those sorts of records. They are neither predecisional nor deliberative, and therefore cannot be privileged.

## II. Defendant cannot rely on Exemption 6.

Exemption 6 protects "[(1)] personnel and medical files and similar files [(2)] the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Records may only be withheld when both elements of this exemption are

---

[6] The records produced to CoA Institute were stamped with a "Draft" watermark. This watermark was superimposed by Defendant during processing of CoA Institute's request and is not original to the records. To wit: Defendant explains throughout its *Vaughn* index that the pilot studies have been "labeled as draft because of [their] predecisional and deliberative nature." *See, e.g.*, Swailes Decl. Ex. F at 37.

satisfied.  *See Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 598 (1982).  *First*, "information

must be contained in personnel, medical or 'similar' files."  *Id.*  The term "similar files" has been

broadly construed to include most records that contain information about an individual, so long as

"the release of [that information] would 'create . . . a palpable threat to privacy.'"  *Judicial Watch,*

*Inc. v. Food & Drug Admin.*, 449 F.3d 141, 152 (D.C. Cir. 2006) (citation omitted).  *Second*, "the

information must be of such a nature that its disclosure would constitute a *clearly unwarranted*

*invasion* of personal privacy."  *Wash. Post Co.*, 456 at 598 (emphasis added).  Individual privacy

interests are balanced "against the public interest (namely, 'the basic purpose of the [FOIA],'

which is 'to open agency action to the light of public scrutiny')."  *Horowitz v. Peace Corps*, 428

F.3d 271, 278 (D.C. Cir. 2005).

Here, Defendant improperly seeks to withhold at least four categories of information under

Exemption 6, namely, "employee names, employee titles, provider productivity data, and

aggregate patient level data."  Swailes Decl. ⁋ 22.  Each of these categories is addressed in turn.

### A.    Employee Names and Employee Titles

Defendant has withheld the names and titles of certain VA employees.  *See generally*

Swailes Decl. Ex. F at 36–59.  It maintains that these government employees have a strong privacy

interest in the disclosure of their identities as participants in the market assessments," and

"[r]elease of their identifies could result in harassment" or "negative reactions to their

participation" in the pilot studies because of their controversial nature.  Swailes Decl. ⁋ 22; *see*

Def.'s Mot. at 15.  Such vague assertions of potential invasion of personal privacy are inadequate.

Defendant bears the burden of demonstrating why its employees have a substantial privacy

interest at stake.  *See Assassination Archives & Research Ctr. v. Cent. Intelligence Agency*, 334

F.3d 55, 57 (D.C. Cir. 2003).  "Generic" or "conclusory" concerns about potential "'harassment

and/or undue embarrassment'" cannot satisfy that burden. *Stonehill v. Internal Revenue Serv.*, 534 F. Supp. 2d 1, 12 (D.D.C. 2008). More is required to avoid the exemption "swallow[ing] the general rule favoring disclosure." *Id.*; *see Morley v. Cent. Intelligence Agency*, 508 F.3d 1108, 1115 (D.C. Cir. 2007) ("[C]onclusory and generalized allegations . . . are unacceptable.").

Civilian federal employees—such as the VA officials at issue here—do not enjoy the same privacy protections as non-government individuals identified in agency records. Moreover, "[t]he disclosure of names [and, by extension, titles] . . . 'is not inherently and always a significant threat to . . . privacy[.]" *Sai v. Transp. Sec. Admin.*, 315 F. Supp. 3d 218, 262 (D.D.C. 2018). Defendant has "offered little more than conclusory assertions . . . without regard to the position[s] held by the relevant employees, the role[s] played by th[ose] employee[s], the substance of the underlying agency action, or the nature of the agency record at issue[.]" *Id.* Defendant also has failed to provide a non-speculative explanation for how disclosure of names and titles could be reasonably expected to result in a clearly unwarranted invasion of privacy. *See id.* at 263. Exemption 6 does not provide a "per se rule" that protects government employee information in any and all cases. Defendant's failure "to explain with meaningful specificity why releasing the challenged information would significantly threaten anyone's privacy" is fatal. *Kleinert v. Bureau of Land Mgmt.*, 132 F. Supp. 3d 79, 97 (D.D.C. 2015).

There is no caselaw to support the notion that Defendant's employees are entitled to heightened privacy merely because VA reform is politically controversial. Defendant also has offered no "factual basis" for previous potential or realized threats to VA staff to buttress its argument against disclosure. *See United Am. Fin., Inc. v. Potter*, 531 F. Supp. 2d 29, 46–47 (D.D.C. 2008). Personal information of government employees, including names and titles, is typically withheld only if "release will endanger a staff member's safety." *Pinson v. Dep't of*

*Justice*, 177 F. Supp. 3d 56, 83 (D.D.C. 2016).[7]  Courts consistently scrutinize whether there is a

*real* threat of such harm, rather than a hint of a suggestion.  *See, e.g.*, *Long v. Office of Personnel*

*Mgmt.*, 692 F.3d 185, 192 (2d Cir. 2012) (discussing "employees in the sensitive agencies and

occupations" of "national security, homeland security, or law enforcement"); *accord Clemmons v.*

*U.S. Army Crime Records Ctr.*, No. 05-02353, 2007 WL 1020827, at *6 (D.D.C. Mar. 30, 2007)

(considering possibility of "harassment or reprisal").[8]

       As for Defendant's suggestion that disclosure of names and titles would not advance the

public interest by offering insight into public understanding of government activity, that is hardly

the case.  There is an acknowledged public interest in "understanding the role played by different

individuals" at the VA, including individual employees involved in the pilot study process.

*Hunton & Williams LLP v. Envtl. Prot. Agency*, 248 F. Supp. 3d 220, 258–59 (D.D.C. 2017) ("This

is a public interest that will, in part, reveal how the agency is functioning."); *see Iglesias v. Cent.*

*Intelligence Agency*, 525 F. Supp. 547, 563 (D.D.C. 1981) ("[T]here is a . . . strong[] public interest

in disclosing the names of the employees and agents who work[]" on government matters.).  As

Defendant's *Vaughn* index explains, VA employees were responsible for providing data to

PricewaterhouseCoopers, participated in the pilot studies, and facilitated the studies by conducting

site tours.  The names of VA employees involved with the pilot studies—or even their official

titles—would at least assist the public in investigating Defendant's national realignment strategy

---

[7] Defendant fails to distinguish why release of employee *titles*, as opposed to actual identifying information, would pose a clearly unwarranted invasion of privacy.  Further specificity must be provided to explain how a "title" of any VA employee, which is unlikely to be unique except at the highest levels of the agency, could be used to "indirectly identity [an] employee."  *See, e.g.*, Swailes Decl. Ex. F at 39.

[8] Defendant's passing reliance on *Forest Service Employees for Environmental Ethics v. U.S. Forest Service*, 524 F.3d 1021 (9th Cir. 2008), *Stern v. Federal Bureau of Investigation*, 737 F.2d 84 (D.C. Cir. 1984), and *Long v. Immigration & Customs Enforcement*, 279 F. Supp. 3d 226 (D.D.C. 2017), is unpersuasive.  *See* Def.'s Mot. at 15, 16–17.  There is nothing in Defendant's *Vaughn* index or accompanying declarations to suggest the employees identified in the responsive records are "lower-level" agents.  Defendant cannot read greater specificity into its *Vaughn* index at this point in the game.

by filing new, targeted FOIA requests. *Cf. Am. Civil Liberties Union v. Dep't of Justice*, 655 F.3d 1, 15 (D.C. Cir. 2011) ("[T]his court takes derivative uses into account in evaluating the impact of disclosure on the public interest[.]").

The caselaw Defendant has cited does little to advance its case. For example, Defendant cites *American Federation of Government Employees, Local 812 v. Broadcasting Board of Governors*, for the proposition that "names and other information relating to another individual" can be withheld. Def.'s Mot. at 16. But no such categorical rule for personally identifying information exists and, more damningly, the requester in *American Federation* never even challenged the agency's Exemption 6 withholdings. *Am. Fed'n of Gov't Emps., Local 812 v. Broad. Bd. of Governors*, 711 F. Supp. 2d 139, 156 (D.D.C. 2010).

Defendant's reliance on *Government Accountability Project v. Department of State* is similarly infirm. In that case, the court held the disclosure of certain email addresses would not serve the public interest, and not "reveal 'what the government is up to,'" precisely because those addresses belonged to "private individuals," as opposed to government employees. *Gov't Accountability Project v. Dep't of State*, 699 F. Supp. 2d 97, 105–06 (D.D.C. 2010). Here, Defendant concedes all the names and titles belong to agency employees.

Defendant cites *Canaday v. U.S. Citizenship & Immigration Services* to suggest—again, incorrectly—that there is some blanket recognition that disclosure of the "identifying information of . . . Federal employees . . . w[ill] not shed light on the workings of [an agency]." 545 F. Supp. 2d 113, 118 (D.D.C. 2008). Yet the *Canaday* court recognized that determining the extent to which disclosure would serve the public interest is a fact-bound consideration and thus not a categorical rule. *Id.*

15

Finally, as a side note, Defendant's *Vaughn* index reflects that additional employee-related information was withheld under Exemption 6. This information is not addressed in Defendant's brief. Specifically, Defendant withheld information "regarding an identified group of staff concerning job performance." Swailes Decl. Ex. F at 57. Defendant also withheld "facility names," Swailes Decl. Ex. F at 57, and a "description of past projects" undertaken by a VA employee. Swailes Decl. Ex. F at 56. None of this information is protected by Exemption 6. An undifferentiated group has no cognizable privacy interests under Exemption 6, which only protects "individuals." *Wash. Post Co.*, 456 U.S. at 602. Information about a "facility," or any sort of physical building, cannot be withheld under Exemption 6 because it "is not associated with any particular individual." *In Def. of Animals v. Nat'l Insts. of Health*, 543 F. Supp. 2d 70, 80 (D.D.C. 2008). And information about past VA projects—for example, a literal description of the agency's prior undertaking—seems unlikely to constitute a "similar file" and therefore fails to meet Exemption 6's threshold requirement. Information "does not become personal solely because it identifies government employees." *Aguirre v. Sec. & Exch. Comm'n*, 551 F. Supp. 2d 33, 54 (D.D.C. 2008). Defendant cannot sidestep this threshold requirement by merely claiming, without evidentiary support, that the "described projects could be used to directly identify the [agency] employee." Swailes Decl. Ex. F at 56.

## B.    Provider Productivity Data

Defendant also withheld "provider productivity data." It is unclear what sort of information might constitute such "data." It is unknown who (or what) qualifies as a "provider." And Defendant has not explained whether the redacted material is even personally identifying. Defendant's *Vaughn* index is hardly enlightening but suggests that "provider productivity data" refers to aggregated data about groups of doctors at VA facilities that has been organized according

16

to medical "specialty." *See, e.g.*, Swailes Decl. Ex. F at 43, 47, 51, 58. Declarant's declarant similarly describes the "data" as "reflect[ing] a level of employee performance." Swailes Decl. ⁋ 22. The declarant does not confirm whether the "data" is personally identifying but instead implies that disclosure could possible lead to "employee identification" because "[s]ome healthcare specialties have [an] extremely small number of providers." Swailes Decl. ⁋ 22.

The inadequacy of Defendant's descriptions aside, aggregate data cannot be withheld under Exemption 6 because it does not pertain to an "individual." *Wash. Post Co.*, 456 U.S. at 602 & 602 n.4 (Exemption 6 does not protect "information unrelated to any particular person"); *In Def. of Animals*, 543 F. Supp. 2d at 80. It would defy common sense to treat information that is entirely "unrelated to any particular person" as satisfying Exemption 6's threshold requirement merely because it is generally connected to employee performance. *Cf. N.Y. Times Co. v. Nat'l Aeronautics & Space Admin.*, 852 F.2d 602, 605–06 (D.C. Cir. 1988) (tape-recorded voices of astronauts does not qualify as "similar file" entitled to Exemption 6 protection). Defendant's own authorities reflect as much. *See* Def.'s Mot. at 13–14.

## C.    Aggregate Patient Level Data

Defendant's attempted withholding of "aggregate patient level data" is similarly infirm because the information is "unrelated to any particular person" and thus fails to meet Exemption 6's threshold requirement. *Wash. Post Co.*, 456 U.S. at 602 & 602 n.4; *In Def. of Animals*, 543 F. Supp. 2d at 80. There is no doubt that *individual* patients have a strong privacy interest in the non-disclosure of their medical files, but such individual files are not at issue. Defendant instead withheld, *inter alia*, "aggregate number[s] of inpatient discharges" and "aggregate number[s] of unique patients using a VHA facility." Swailes Decl. Ex. F at 46; *see also* Swailes Decl. Ex. F at

50 ("number of unique outpatients," "number of unique patients for outpatient encounters by clinical service line," and "aggregate number of unique patients treated").

The record does not suggest PricewaterhouseCoopers ever incorporated private patient data into the pilot studies, and certainly nothing that was personally identifying. The pilot studies are entirely distinct from the types of records at issue in the cases cited by Defendant, *see* Def.'s Mot. at 15–16, where the court considered *lists of names* of patients admitted to a Naval hospital, *Nat'l Sec. News Serv. v. Dep't of the Navy*, 584 F. Supp. 2d 94, 97 (D.D.C. 2008), or details about a *specific* "employee's physical ailments and medical advice." *Pub. Emps. for Envtl. Responsibility v. Dep't of the Interior*, No. 06-182, 2006 WL 3422484, at *4 n.4 (D.D.C. Nov. 28, 2006). Defendant cannot withhold aggregate patient level data under Exemption 6.

### III. Defendant has not satisfied its burden under the "foreseeable harm" standard.

The FOIA mandates agencies to release records unless they fall under an enumerated exemption. "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant object of the Act[.]" *Klamath*, 532 U.S. at 7–8 (internal citations omitted). With the passage of the FOIA Improvement Act of 2016, Congress raised the standard by which an agency must evaluate its withholdings. An agency may now only "withhold information" under the FOIA "if [it] *reasonable foresees* that disclosure would harm an interest protected by an exemption[.]" 5 U.S.C. § 552(a)(8)(A)(i)(I) (emphasis added).

Under the "foreseeable harm" standard, is it not enough that an agency make a case for the *technical* application of a statutory exemption; it must articulate *precise* reasons why *specific* records, or portions thereof, could be reasonably foreseen to harm an interest protected by an exemption. *See* 162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016) (statement of Sen. Leahy) ("Importantly, codifying the presumption of openness [*i.e.*, the foreseeable harm standard] will

help reduce the perfunctory withholding of documents through the overuse of FOIA exemptions. It requires agencies to consider whether the release of particular documents will cause any foreseeable harm to an interest the applicable exemption is meant to protect.").  Congress did not merely codify existing policies or practices.  To construe the FOIA in such a way would offend the traditional canon against surplusage, which directs "courts 'to give effect, if possible, to every clause and word of a statute[.]'"  *Ibrahim v. Dep't of State*, 311 F. Supp. 3d 134, 140 (D.D.C. 2018).  The unambiguous language of the foreseeable harm standard manifests Congress's intent to require something more of an agency when it defends its withholdings.

Courts in this jurisdiction have repeatedly recognized the impact of the new standard and the added burden it places on an agency.  *See, e.g.*, *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018).  It is not enough that an agency merely recites "boiler plate language to justify [its] redactions."  *Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019).  For example, "general explanations of the possibility of a 'chilling effect' fall short of articulating 'a link between the specified harm and specific information contained in the material withheld.'"  *Id.* (citation omitted); *see Machado Amadis v. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) ("[The requester] contends that agencies, to justify withholding records under FOIA's foreseeable-harm provision, cannot simply rely on 'generalized' assertions that disclosure 'could' chill deliberations.  We have no quarrel with that proposition.").

Here, with Exemption 5, Defendant claims disclosure could "interfere[] with VA decision making related to the VA National Realignment Strategy, create[] public confusion about [that process], and [lead to] harassment of VA personnel[.]"  Def.'s Mot. at 13.  Yet, on all counts, Defendant has failed to offer *factual support* for the supposed harms.  For example, one of Defendant's declarants claims that "[r]eleasing factual material used in the creation and testing of

the methodology would chill future agency deliberations." Swailes Decl. ¶ 21. It is unclear why this would be the case. The pilot studies, which were created by a non-governmental contractor, only pertain to the finalization of a uniform methodology for future market assessments—they do not reveal anything deliberative about Defendant's ongoing development of proposed criteria and realignment recommendations.

It is similarly difficult to countenance Defendant's suggestion that disclosure could "create concern" or cause individuals to "draw erroneous conclusions or disagree with action that they presume VA will take and create obstacles and resistance to VA's completion of the market assessments[.]" Swailes Decl. ¶ 21; *see also* Stuppy Decl. ¶ 12. As CoA Institute has explained, the MISSION Act of 2018 fundamentally changed the process by which VA reforms will be accomplished. Defendant is no longer permitted to undertake reforms on its own initiative but must prepare criteria for developing recommended reforms that will be open to public comment and sent to Congress. *See supra* at pp. 3–4. Even after those criteria are finalized, the ultimate authority to implement any national realignment strategy lies with the President. *See id.* There can be little concern about possible public "concern" or "confusion," when the public is already aware of the VA's ongoing efforts and is expected to participate in the process. On the contrary, release of the pilot studies could benefit the VA's realignment efforts by providing useful information to the public, which it can consider during the comment period mandated by the MISSION Act. *See* Pub. L. No. 115-182, § 203(a)(2), 132 Stat. at 1446.

As for the possibility that disclosure of the pilot studies—which, again, are distinct from the ongoing ninety-six geographic market assessments—would lead to individuals or groups fomenting "obstacles" and "resistance," there is simply no *reasonable* basis to expect that result. In short, Defendant has offered nothing but "generic and nebulous articulations of harm," which

are "insufficient." *Judicial Watch, Inc. v. Dep't of Justice*, No. 17-0832, 2019 WL 4644029, at *5 (D.D.C. Sept. 24, 2019). Further context that specifically ties the expected harms to the records at issue, and in a reasonable manner, is required. *See Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 107–08 (D.D.C. 2019).

Defendant also failed to describe how it satisfied the foreseeable harm standard when applying Exemption 6. There is nothing in the FOIA that precludes the standard from applying to Exemption 6. *See* 5 U.S.C. § 552(a)(8)(A)(i)(II). Defendant concedes as much. *See* Def.'s Mot. at 17. Despite Defendant's attempt to account for how it met its burden under the standard, *see id.*, there is nothing in its *Vaughn* index or supporting declarations that addresses foreseeable harm. Defendant even inserts the word "providers" in brackets in the middle of a quote concerning employees, as if to mask its failure to consider whether harm would result from disclosure of provider productivity and aggregate patient data. *See id.* (citing Swailes Decl. ⁋ 22). More importantly, Defendant cannot rely on its argument for *technical application* of Exemption 6. The foreseeable harm standard requires meaningful and independent analysis *beyond* establishing a substantial privacy interest and the likelihood of an unwarranted invasion of personal privacy.

For these reasons, the Court should reject Defendant's use of Exemptions 5 and 6 for failure to satisfy the FOIA's foreseeable harm standard.

## IV. Defendant did not segregate and release non-exempt portions of responsive records.

Regardless of whether Defendant can sustain its use of any statutory exemptions, it has failed to show that it released all reasonably segregable portions of the records at issue. The failure to carefully review responsive records conflicts with the explicit mandate of the FOIA, which requires an agency to release "any reasonably segregable portion of a record . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b); *see id.* § 552(a)(8)(A)(ii)(II). An adequate

segregability analysis is so vital to the FOIA's broad mandate of disclosure that a court has "an affirmative duty to consider the segregability issue *sua sponte*." *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999). "A district court that 'simply approve[s] the withholding of an entire document without entering a finding on segregability, or lack thereof,' errs." *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993).

Defendant has failed to defend the reasonableness of its efforts to release segregable portions of the pilot studies and briefing documents. Without an adequate showing that "explain[s] in detail which portions of the [records] are disclosable and which are allegedly exempt," an agency cannot carry its burden and is not entitled to summary judgment. *Edmonds Inst. v. Dep't of the Interior*, 383 F. Supp. 2d 105, 108 (D.D.C. 2005). Here, Defendant's declarant merely asserts, without adequate specificity and in conclusory fashion, that she "was unable to reasonably segregate any non-exempt material." Swailes Decl. ¶ 23 ("[Partial disclosure of non-exempt material] would have minimal or no informative or substantive content, so as to render the document[s] essentially meaningless."). Defendant's position is deficient for at least three reasons.

*First*, courts have rejected the categorical application of Exemption 5, particularly with the "deliberative or policy-making process[]" privileges, because it blurs the distinction between "deliberative" materials, on the one hand, and "purely factual, investigative matters on the other." *Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 89 (1973). To the extent there is factual material in the pilot studies and briefing documents, Defendant must release it because "factual segments which do not reveal the deliberative process . . . are not intertwined with the policy-making process." *Ryan*, 617 F.2d at 791; *see supra* at p. 10 n.5.

*Second*, Defendant's reprocessing of the pilot studies and briefing documents prior to filing its motion for summary judgment serves as evidence that it has already once *overredacted* records

and thus failed to conduct the necessary line-by-line review for non-exempt material.  *See* Pl.'s SUMF ¶ 18; *see also* Swailes Decl. ¶ 26.  Defendant argues the implication of this midnight-hour supplemental production is that it "fulfilled its segregability responsibility."  Def.'s Mot. at 18. But this fact actually creates the opposite inference.  It is reasonable to remain skeptical of Defendant's continued withholding of hundreds of pages of responsive records in full.  *See Favish*, 541 U.S. at 159 (discussing evidence required to overcome presumption of regularity for agency's compliance with the FOIA).

*Third*, Defendant is mistaken that it need not disclose segregable material that it finds "meaningless" or of "minimal or no informative or substantive content."  Def.'s Mot. at 18; Swailes Decl. ¶ 23.  This confuses the relevant standard, which addresses "non-exempt information so inextricably intertwined with . . . exempt information that [its] release . . . would produce only *incomplete, fragmented, unintelligible sentences* composed of *isolated meaningless words*."  *Nat'l Sec. Archive Fund, Inc. v. Cent. Intelligence Agency*, 402 F. Supp. 2d 211, 220–21 (D.D.C. 2005) (emphasis added).  Defendant is not positioned to judge whether portions of the pilot studies and briefing documents will be "useful" or informative to CoA Institute.  Courts often require agencies to release names and dates associated with records, for example, even if other substantive content is exempt.  *See, e.g.*, *Judicial Watch, Inc. v. Dep't of the Treasury*, 796 F. Supp. 2d 13, 29–30 (D.D.C. 2011) (ordering agency to release portions of meeting minutes that indicate dates and attendees).  Here, the records at issue likely contain factual information that will remain both meaningful *and* informative, even if heavily redacted.

## V.   *In camera* review of the records at issue would be appropriate.

The FOIA authorizes a district court to conduct an *in camera* inspection of an agency's withholdings to determine whether it has met its burden in justifying the application of any

statutory exemptions. 5 U.S.C. § 552(a)(4)(B). Based on the foregoing discussion of the improper use of Exemptions 5 and 6, as well as Defendant's questionable efforts to segregate non-exempt portions of records for release, it would be appropriate for the Court to conduct an *ex parte* and *in camera* inspection of the pilot studies and briefing documents. *See Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) ("[D]istrict courts have 'broad discretion' to decide whether *in camera* review is necessary to determine whether the government has met its burden[.]").

*In camera* review of Defendant's withholdings would be particularly apt because the agency has failed to offer satisfactory justifications for its use of the deliberative process privilege. *See supra* at pp. 8–11. The agency's Exemption 6 argument likewise suffers from serious deficiencies. *See supra* at pp. 11–18. CoA Institute has also identified points of contradiction between Defendant's declarants and the agency's *Vaughn* index. *See, e.g., supra* at p. 10 n.5. Direct review of the unredacted records by the Court is therefore warranted. *See Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 997 (D.C. Cir. 1998) ("If the agency fails to provide a sufficiently detailed explanation to enable the district court to make a de novo determination of the agency's claims of exemption, the district court then has several options, including inspecting the documents *in camera*[.]"); *see also Quiñon v. Fed. Bureau of Investigation*, 86 F.3d 1222, 1229 (D.C. Cir. 1996) ("[W]here an agency's affidavits merely state in conclusory terms that documents are exempt from disclosure, an *in camera* review is necessary." (citation omitted)).

*In camera* review would not be onerous. *See id.* at 1228 (the number of records to be inspected is "another . . . factor to be considered" when determining whether in camera review is appropriate); *see also People for the Am. Way Found.*, 503 F. Supp. 2d at 307 ("*In camera* review may be appropriate when . . . 'the number of records involved is relatively small[.]" (citation omitted)). There are only seven records at issue here. Pl.'s SUMF ⁋ 11. Admittedly, these records

24

total just under 500 pages.  But given the relative similarity between each of the three pilot studies—and, presumably, the accompanying briefing documents—the Court could alternatively order Defendant to submit a single report and briefing document, to aid its adjudication of the pending cross-motions.  This would serve judicial economy.  *See Carter v. Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987) ("[W]hen the requested documents 'are few in number and of short length,' *in camera* review may save time and money." (citation omitted)).

The Court should therefore order Defendant to submit unredacted versions of the records at issue for the Court's consideration.

## CONCLUSION

For these reasons, CoA Institute respectfully requests that the Court deny Defendant's motion for summary judgment and grant CoA Institute's cross-motion for summary judgment. CoA Institute further requests that the Court order Defendant to re-process and produce all responsive records in their entirety within the next twenty days.

Dated: February 19, 2021                     Respectfully submitted,

                                             */s/ Ryan P. Mulvey*
                                             Ryan P. Mulvey
                                             (D.C. Bar No. 1024362)

                                             CAUSE OF ACTION INSTITUTE
                                             1310 North Courthouse Road, Suite 700
                                             Arlington, VA 22201
                                             Telephone: (571) 482-4182
                                             ryan.mulvey@causeofaction.org

                                             *Counsel for Plaintiff CoA Institute*