**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| CAUSE OF ACTION INSTITUTE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 20-0997 (BAH) |
| ) | |
| U.S. DEPARTMENT OF VETERANS AFFAIRS, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**REPLY BRIEF IN SUPPORT OF PLAINTIFF'S
<u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

Ryan P. Mulvey
(D.C. Bar No. 1024362)

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Telephone: (571) 482-4182
ryan.mulvey@causeofaction.org

*Counsel for Plaintiff CoA Institute*

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................................... iii

Introduction ................................................................................................................................. 1

Argument ..................................................................................................................................... 1

    I.    Defendant has no right to entry of summary of judgment on the question of search
        adequacy because there is no ongoing legal dispute over that issue.................................... 1

    II.   Defendant misstates the substance and relevance of the MISSION Act of 2018. .............. 2

    III.  Defendant cannot rely on Exemption 5 and the deliberative-process privilege. ................. 5

    IV.  Defendant cannot rely on Exemption 6. ............................................................................ 8

         A.    Employee Names and Employee Titles .................................................................. 9

         B.    Provider Productivity Data .................................................................................... 12

         C.    Aggregate Patient Level Data ............................................................................... 12

    V.   Defendant has not satisfied its burden under the "foreseeable harm" standard................ 13

         A.    Exemption 5 ........................................................................................................... 14

         B.    Exemption 6 ........................................................................................................... 15

    VI.  Defendant did not segregate and release non-exempt portions of responsive records. .... 15

    VII. Defendant failed to respond to CoA Institute's request for *in camera* review. ............... 17

Conclusion ................................................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aguirre v. Securities & Exchange Commission,*
 551 F. Supp. 2d 33 (D.D.C. 2008) ......................................................................12

*American Civil Liberties Union v. Department of Justice,*
 655 F.3d 1 (D.C. Cir. 2011) ...............................................................................13

*Better Government Ass'n v. Department of State,*
 780 F.2d 86 (D.C. Cir. 1986) ...............................................................................2

*Carter v. Department of Commerce,*
 830 F.2d 388 (D.C. Cir. 1987) ...........................................................................17

*Citizens for Responsibility & Ethics in Washington v.*
 *General Services Administration,*
 No. 18-2071, 2021 WL 765659 (D.D.C. Feb. 26, 2021) ......................................8

*Department of State v. Washington Post Co.,*
 456 U.S. 595 (1982) ....................................................................................11, 13

*Edmonds Institute v. Department of the Interior,*
 383 F. Supp. 2d 105 (D.D.C. 2005) ...................................................................15

*Hunton & Williams LLP v. Environmental Protection Agency,*
 248 F. Supp. 3d 220 (D.D.C. 2017) ...................................................................11

*Iglesias v. Central Intelligence Agency,*
 525 F. Supp. 547 (D.D.C. 1981) ........................................................................11

*In Defense of Animals v. National Institutes of Health,*
 543 F. Supp. 2d 70 (D.D.C. 2008) ................................................................12, 13

*Judicial Watch, Inc. v. Department of Commerce,*
 375 F. Supp. 3d 93 (D.D.C. 2019) .....................................................................13

*Loving v. Department of Defense,*
 550 F.3d 32 (D.C. Cir. 2008) .............................................................................17

*Machado Amadis v. Department of State,*
 971 F.3d 364 (D.C. Cir. 2020) ...........................................................................13

*National Archives & Records Administration v. Favish,*
 541 U.S. 157 (2003) ...........................................................................................16

*People for the American Way Foundation v. National Park Service,*
    503 F. Supp. 2d 284 (D.D.C. 2007) ...................................................................17

*Pinson v. Department of Justice,*
    177 F. Supp. 3d 56 (D.D.C. 2016) .....................................................................14

*Quiñon v. Federal Bureau of Investigation,*
    86 F.3d 1222 (D.C. Cir. 1996) ...........................................................................17

*Rosenberg v. Department of Defense,*
    342 F. Supp. 3d 62 (D.D.C. 2018) .....................................................................13

*Sai v. Transportation Security Administration,*
    315 F. Supp. 3d 218 (D.D.C. 2018) .....................................................................9

*Schiller v. National Labor Relations Board,*
    964 F.2d 1205 (D.C. Cir. 1992) .........................................................................15

*Sierra Club, Inc. v. U.S. Fish & Wildlife Service,*
    No. 19-2315, 2021 WL 765727 (D.D.C. Feb. 26, 2021) .........................6, 8, 14, 15

*Stalcup v. Central Intelligence Agency,*
    768 F.3d 65 (1st Cir. 2014) ..................................................................................7

*U.S. Fish & Wildlife Service v. Sierra Club, Inc.,*
    No. 19-547, 2021 WL 816352 (U.S. Mar. 4, 2021) ............................................5, 6

*Williams v. Johanns,*
    No. 03-2245, 2005 WL 8177881 (D.D.C. Oct. 24, 2005) ......................................14

**Statutes**

5 U.S.C. § 552(a)(8)(A)(i)(I) .......................................................................................13

5 U.S.C. § 552(a)(8)(A)(ii)(II) .....................................................................................15

5 U.S.C. § 552(b) ..........................................................................................................15

38 U.S.C. § 303 ..............................................................................................................4

VA MISSION Act of 2018, Pub. L. No. 115-182, 132 Stat. 1393 (2018) ................3, 7

**Rules**

Federal Rule of Civil Procedure 56(a) ...........................................................................2

# INTRODUCTION

This case is about a Freedom of Information Act ("FOIA") request seeking records related to several "pilot study" market assessments, and related briefing documents, prepared by a non-governmental contractor for Defendant Department of Veterans Affairs ("VA"). Defendant has withheld the records under Exemption 5, along with the deliberative-process privilege, and Exemption 6. As Plaintiff Cause of Action Institute ("CoA Institute") set out in its opening brief, Defendant has not met its burden for applying either of these exemptions. Defendant offers paltry rebuttal. Not only does it mischaracterize the relevance of the MISSION Act of 2018, but it confuses the different decisional processes relevant to the deliberative-process privilege inquiry and overstates the role of the pilot studies in the VA's broader reform efforts. As for Exemption 6, Defendant has ignored several of CoA Institute's arguments and failed to show how certain information even qualifies for protection under that exemption's threshold requirement that it relate to an individual. Defendant also failed to respond to CoA Institute's request that the Court conduct *in camera* review of the records at issue. CoA Institute asks the Court to deny Defendant's motion for summary judgment and grant CoA Institute's cross-motion.

# ARGUMENT

## I.    Defendant has no right to entry of summary of judgment on the question of search adequacy because there is no ongoing legal dispute over that issue.

Defendant persists in arguing that its search for responsive records is relevant to the pending cross-motions for summary judgment. Yet "[t]he parties agreed to narrow the scope of summary judgment to the treatment of responsive records released as part of Defendant's first production—*i.e.*, the three pilot studies and accompanying briefing documents." Pl.'s Mem. of P. & A. in Opp'n to Def.'s Mot. for Summ. J. & in Supp. of Pl.'s Cross-Mot. for Summ. J. at 7 n.3 [hereinafter "Pl.'s Mot."], ECF No. 17-1; Pl.'s Statement of Undisputed Material Facts ¶ 17

[hereinafter "Pl.'s SUMF"], ECF No. 17-2 ("[T]he parties agreed to narrow the scope of summary judgment to those responsive records identified in Defendant's May 11, 2020 IAD.").  Defendant concedes that it agreed to this narrowing.  Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 17, ECF No. 19-1 ("Undisputed.").  But Defendant still insists it is entitled to judgment as a matter of law on the question of search adequacy, as if it were a live issue.  It is not.  And the federal rules do not contemplate judgment on a matter that the parties have resolved between themselves.  *See* Fed. R. Civ. P. 56(a).

Defendant's mere filing of a motion does not warrant granting summary judgment.  Any determination that Defendant's search was adequate would constitute an advisory opinion in contravention of Article III of the Constitution.  "A federal court is constitutionally forbidden to render advisory opinions or 'to decide questions that cannot affect the rights of litigants in the case before them.'"  *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 90–91 (D.C. Cir. 1986) (citing *N. Carolina v. Rice*, 404 U.S. 244, 246 (1971).  "Any judgment issued must resolve a clear and substantial controversy[.]"  *Id.* at 91 (cleaned up and citation omitted).  Thus, because the parties here agreed to limit the scope of briefing, Defendant's continued plea for entry of judgment in its favor on search adequacy is misplaced.

## II.    Defendant misstates the substance and relevance of the MISSION Act of 2018.

The nature of the pilot studies, and their role in the VA reform process, is essential to disposition of this case.  That nature cannot be divorced from the MISSION Act of 2018, which clarified Congress's intent for Defendant's national realignment strategy.  *See* Pl.'s Mot. at 3–4.  The MISSION Act "removed final decisional authority from Defendant over any realignment efforts," and instead required the involvement of multiple stakeholders, including the public.  *Id.* at 3.  Although Defendant retains responsibility for finalizing criteria for recommendations and

submitting such recommendations to the Asset and Infrastructure Review Commission, final action is ultimately left to the President. *See* Pub. L. No. 115-182, §§ 203(d), 204(a), 132 Stat. 1393, 1449–50; *see also* Decl. of Christine M. Stuppy ⁋ 10, ECF No. 16-3.

The pilot studies—which the VA commissioned to finalize a uniform methodology—have no continuing relevance in the statutorily required capacity and commercial market assessments. *See* Pub. L. No. 115-182, § 203(b)(3)(A), 132 Stat. at 1447. One of Defendant's declarants has admitted as much. *See* Stuppy Decl. ⁋ 6 ("The pilot market assessments were not used for any purpose other than to evaluate the market assessment methodology and to determine which deliverables might be of interest to senior leaders."); Stuppy Decl. ⁋ 7 ("The purpose of the pilot market assessments—beyond providing deliverables that memorialized the work—was *solely to test and refine the market assessment methodology* for performing comprehensive market assessment reviews of the enterprise.").

Defendant avoids all this and continues to conflate the pilot studies with the nation-wide market assessments, as well as other aspects of the realignment process. For example, Defendant protests that the MISSION Act "vests VA with control over the process leading to . . . recommendations [for reform] . . . [and] notes that the criteria [published after public comment] are used *by the VA* in making its recommendations." Def.'s Reply Mem. in Supp. of Def.'s Mot. for Summ. J. & Resp. in Opp'n to Pl.'s Mot. for Summ. J. at 3 [hereinafter "Def.'s Opp'n"], ECF No. 19. This is irrelevant. Defendant admittedly has responsibility for finalizing selection criteria and proposing reforms—the issue is that *those criteria and recommendations have nothing to do with the pilot studies*. *See, e.g.*, Stuppy Decl. ⁋⁋ 6–7. The pilot studies only reflect finalization of the uniform methodology used for the nationwide ninety-six market assessments. Disclosure of the pilot studies would do nothing to reveal how Defendant applied the uniform methodology or

how it is presently devising selection criteria.  Defendant's attempt to distract the Court by referring to the MISSION Act's requirement that the Secretary "prepare a report detailing recommendations regarding modernization or realignment of VHA medical facilities" does not help its case.  *See* Def.'s Opp'n at 3.  That report has nothing to do with the pilot studies.

Perhaps aware of this inconvenient fact, Defendant tries to suggest the pilot studies could be used at a later stage in the realignment process because the MISSION Act "provides latitude to the Secretary" to consider "[a]ny other factors[.]"  *Id.*  But that contradicts the agency's arguments elsewhere that the pilot studies were only used to complete a uniform methodology and served no further basis for the agency's reform agenda.  *See* Stuppy Decl. ¶¶ 6–7.  Indeed, both of Defendant's declarants undermine any notion that the agency expected to use the pilot studies for other purposes.  *See* Stuppy Decl. ¶ 13 ("[T]he final output of the pilots was a methodology and not intended to be opportunities for implementation[.]"); Stuppy Decl. ¶ 15 ("The pilot assessments do not offer an overarching review of all the markets, VISNs, or National initiatives, . . . and do not contemplate the totality of the entire effort[.]"); Stuppy Decl. ¶ 15 ("Pilot or individual market assessment opportunities do not contemplate the overall National Realignment Strategy[.]"); Decl. of Barbara Swailes ¶ 19, ECF No. 16-2 ("[T]he geographic areas covered in the pilot market assessments are being re-done[.]").

As a last-ditch effort, Defendant appeals to the Secretary's broad responsibility for "health care administration, including operation of [the VA's] health care facilities nationwide."  Def.'s Opp'n at 3–4.  Defendant's reliance on that general responsibility is unavailing, and its citation to the VA's organic statute is curious.  Section 303 only identifies the Secretary as agency head and vests him with responsibility for "proper execution and administration of all laws administered by the [VA]."  38 U.S.C. § 303.  This provision is not a supplemental source of authority, especially

since Congress has otherwise spoken with the MISSION Act of 2018.  Section 303 cannot turn non-deliberative materials into privileged records.

**III.    Defendant cannot rely on Exemption 5 and the deliberative-process privilege.**

The deliberative-process privilege does not protect the pilot market assessments because they are neither predecisional nor deliberative.  Defendant used them to finalize a uniform methodology but never intended to use them for policymaking.  *See* Pl.'s Mot. at 8–11; Stuppy Decl. ¶¶ 6–7, 9–10.  Defendant offers three counterarguments.  None is persuasive.

*First*, pointing to the Supreme Court's recent decision in *U.S. Fish & Wildlife Service v. Sierra Club, Inc.*, Defendant suggests that the pilot studies, and related briefing documents, are privileged because what matters is the "VA's final decision" in the realignment process—"the report required under the MISSION Act."  Def.'s Opp'n at 5.  This is a serious misreading of *Sierra Club* and leads to an absurd result if taken to its logical conclusion.  Defendant's position would require treating *everything* even remotely related to VA reform efforts as privileged.  The agency's behavior in the instant proceeding, however, shows that this cannot be the right result.  *See* Pl.'s SUMF ¶¶ 15–16 (second and third productions, totaling nearly 1,500 pages).

In *Sierra Club*, the Supreme Court held that draft biological opinions prepared as part of a statutorily required consultation process were protected by the deliberative-process privilege, even if they reflected an agency's ostensible "final" view on a proposed rule.  Although there were several grounds for the Court's decision, relevant here it characterized the biological opinions as more like "drafts of drafts" as the defendant agencies never held them out to be "final" and considered them "subject to change," particularly given the "administrative context" of the consultation process required under the Endangered Species Act.  No. 19-547, 2021 WL 816352,

at *5 (U.S. Mar. 4, 2021); *see id.* at *6 ("[T]he decisionmakers . . . neither approved the drafts nor sent them to the EPA.").

This case is distinguishable. "[T]he pilot studies cannot be *predecisional* because they only reflect the consummation of the design of the uniform methodology." Pl.'s Mot. at 9; *see* Stuppy Decl. ⁋⁋ 6–7, 10. They have no relevance to other aspects of the realignment process. *See supra* at pp. 2–5 (discussing MISSION Act of 2018). In this respect, *Sierra Club* favors CoA Institute: "What matters . . . is not whether a document is last in line [in some overarching process], but whether it communicates a policy on which the agency has settled." 2021 WL 816352, at *4. Defendant impliedly proposes a formal test for Exemption 5, which elides the pilot studies with the nation-wide market assessments, and criteria and recommendation process. The *Sierra Club* court, however, rejected a formal approach in favor of a "functional . . . inquiry." *See id.* at *7.

Defendant's declarants confirm that the pilot studies "were not used for any purpose other than to evaluate the market assessment methodology." Stuppy Decl. ⁋ 6. Their sole purpose was "*to test and refine the market assessment methodology* for performing comprehensive market assessment reviews[.]" Stuppy Decl. ⁋ 7. They "were not intended to be acted upon[.]" Stuppy Decl. ⁋ 9. "Nothing in this description indicates" that the pilot studies reflect "advisory opinions, recommendations, or deliberations," let alone "personal opinion[s] of an agency official." *Sierra Club, Inc. v. U.S. Fish & Wildlife Serv.*, No. 19-2315, 2021 WL 765727, at *4 (D.D.C. Feb. 26, 2021) (cleaned up and citations omitted). "Simple relevance to the policy-making process is not sufficient to bring a document within the ambit of Exemption 5." *Id.* (citing *Citizens for Responsibility & Ethics in Wash. v. Dep't of Homeland Sec.*, 648 F. Supp. 2d 152, 158–59 (D.D.C. 2009)). And there is no basis to suppose that disclosure here would impede or "chill" agency decision-making. *See id.* at *5. The finalization of the uniform methodology is the relevant

decision at hand, and the pilot studies "are *final work product*, delivered to Defendant by its contractor" as part of that decision. *See* Pl.'s Mot. at 10–11.

*Second*, and relatedly, Defendant suggests that the pilot studies "cannot be considered final" because "VA is reassessing each of th[ose] markets[.]" Def.'s Opp'n at 5. It is unclear why reassessment of the three geographical markets from the pilot process matters. Defendant undertook the pilot studies to "develop a uniform methodology," which "would permit VHA to apply a *consistent method of conducting market assessments across all 96 markets*." Stuppy Decl. ⁋ 6 (emphasis added). The agency never intended to treat the pilot studies as the sort of comprehensive market assessments required by Congress as the basis for final criteria and recommendations for the national realignment strategy. *See* Pub. L. No. 115-182, § 203(b)(3)(A); Stuppy Decl. ⁋ 7 ("The purpose of the pilot market assessments—beyond providing deliverables that memorialized the work—was *solely to test and refine the market assessment methodology* for performing comprehensive market assessment reviews of the enterprise."); Stuppy Decl. ⁋ 13 ("[T]he final output of the pilots was a methodology and not intended to be opportunities for implementation[.]"); *see also* Stuppy Decl. ⁋⁋ 9–10, 15.

For this reason, Defendant's reliance on *Stalcup v. Central Intelligence Agency* is misplaced. *See* Def.'s Opp'n at 5–6. In *Stalcup*, the First Circuit rejected a requester's argument that the CIA's supplementation of an earlier report was post-decisional and an after-the-fact attempt to reconcile an earlier agency decision with new data. *See* 768 F.3d 65, 71–72 (1st Cir. 2014). The court explained that the CIA instead was engaged in an ongoing process of ensuring its "prior assessment was accurate." *Id.* Here, however, Defendant's reassessment of the three geographic markets chosen for the pilot studies is decidedly *not* an attempt to supplement or modify the outcomes of those assessments, which only fine-tuned the uniform methodology.

*Third*, Defendant argues that the pilot studies are "deliberative" because certain aspects of their format and content are still "being refined" and are "inextricably intertwined with the draft market assessments currently underway." Def.'s Opp'n at 6–7 (citing Stuppy Decl. ⸿ 9). As for the former claim, it is important to distinguish between the pilot studies and how Defendant's might have used them for other inconsequential purposes, such as deciding how best to "format" and present data. *See* Stuppy Decl. ⸿ 9. Disclosure of the pilot studies would not provide insight into what actions were undertaken to change how market assessments are styled or their content rearranged. More importantly, "[s]imple relevance to the policy-making process is not sufficient to bring a document within the ambit of Exemption 5." *Sierra Club*, 2021 WL 765727, at *4. There must be some broader function and significance to a document in the overall scheme of agency decisionmaking. *See Citizens for Responsibility & Ethics in Wash. v. Gen. Servs. Admin.*, No. 18-2071, 2021 WL 765659, at *3 (D.D.C. Feb. 26, 2021). Defendant has done little to elaborate on what, precisely, is "still constantly being refined" in the pilot studies. Defendant's declarants elsewhere highlight that inadequacy by insisting that the agency used the pilot studies "*solely to test and refine the market assessment methodology*[.]" Stuppy Decl. ⸿ 6.[1]

The pilot studies and related briefing documents are neither predecisional nor deliberative, and therefore they cannot be privileged. The Court should order Defendant to release the records.

**IV.    Defendant cannot rely on Exemption 6.**

Defendant has withheld at least four categories of information under Exemption 6, including "employee names, employee titles, provider productivity data, and aggregate patient level data." Swailes Decl. ⸿ 22. The portions of records containing this information either fail to

---

[1] CoA Institute highlighted the contradiction between Defendants' declarants on whether the pilot studies are "inextricably intertwined" with the ongoing nation-wide market assessments. *See* Pl.'s Mot. at 10 n.5. Defendant provided no clarification.

meet the exemption's threshold requirement or they do not implicate a substantial individual privacy interest. The public interest in disclosure also overrides any purported privacy interests. *See* Pl.'s Mot. at 11–18. Defendant's responses to CoA Institute's arguments—at least when Defendant has chosen to provide them—are inadequate. The Court should order Defendant to release in full the records withheld under Exemption 6.

### A.    Employee Names and Employee Titles

Civilian federal employees do not enjoy the same privacy protections as non-government individuals identified in agency records. Indeed, "[t]he disclosure of names [and, by extension, official titles] . . . 'is not inherently and always a significant threat to . . . privacy[.]'" *Sai v. Transp. Sec. Admin.*, 315 F. Supp. 3d 218, 262 (D.D.C. 2018). An agency must provide a non-conclusory account of why particular employees, given their respective positions and roles within the government, and their involvement with the "substance of the underlying agency action" implicated by responsive records, could face a real threat of harassment or invasion of their personal privacy. *Id.*; *see* Pl.'s Mot. at 13–16. An agency cannot categorically withhold identifying information of public servants. Each of Defendant's counterarguments is unavailing.

*First*, Defendant maintains that "[t]he VA's declarants described in detail the role the agency employees played in the market assessment process[.]" Def.'s Opp'n at 8. Hardly. Ms. Swailes merely described, with a broad brush, how all employees implicated in the pilot studies and briefing documents were "participants in the market assessments." Swailes Decl. ⁋ 22. And Ms. Stuppy provided an even vaguer description of how PricewaterhouseCoopers "worked with the VA, members of the VHA SAS staff, and VHA field participants to conduct" the pilot studies, and without even offering the statement as a basis for the use of Exemption 6. Stuppy Decl. ⁋ 7. Defendant's *Vaughn* index provides *some* insight into how individual employees may have been

9

involved with the pilot studies, but it contains no detail on the role of those employees *within the VA*. CoA Institute raised one aspect of this deficiency—*i.e.*, the lack of anything in the record to establish whether the VA employees identified in the responsive records were "lower-level." Pl.'s Mot. at 14 n.8. CoA Institute also highlighted Defendant's failure to "distinguish why release of employee *titles*, as opposed to actual identifying information, would pose a clearly unwarranted invasion of privacy." *Id.* at 14 n.7. On each point, Defendant failed to respond.

*Second*, Defendant continues to omit any factual basis to reasonably conclude that the disclosure of employee identities or titles would lead to an unwarranted invasion of privacy. "There is no caselaw to support the notion that Defendant's employees are entitled to heightened privacy merely because VA reform is politically controversial." Pl.'s Mot. at 13. Rather than submit supplemental declarations that show why factual evidence of potential harassment or threats of violence counsel against disclosure, Defendant has instead provided the Court with a page-length pair of footnotes, which link to fourteen news articles published over the past seven years. *See* Def.'s Opp'n at 9–10 nn. 1 & 2. That hardly constitutes a substantive rebuttal of CoA Institute's argument. Defendant does not even explain why any of these stories is relevant to the pilot studies, especially when some of the stories appear to concern perfectly legitimate public responses to VA reform, such as litigation or lobbying to secure new legislation.

*Third*, Defendant insists that "the disclosure of the names and positions" of agency employees "would not advance the public interest" because "the government activity [here] is known to the public" and "VA's actions are in furtherance of a detailed congressional mandate[.]" Def.'s Opp'n at 11. This does not follow. That the pilot studies are publicly known to have taken place pursuant to a legislative directive does not insulate specific details—such as employee

information—from disclosure.  Nor does it diminish the usefulness of that information.[2]  "[T]here is a . . . strong[] public interest in disclosing the names of the employees and agents who work" on government matters.  *Iglesias v. Cent. Intelligence Agency*, 525 F. Supp. 547, 563 (D.D.C. 1981); *see Hunton & Williams LLP v. Envtl. Prot. Agency*, 248 F. Supp. 3d 220, 258–59 (D.D.C. 2017).  Defendant failed to address the import of CoA Institute's authorities.  It also failed to rebut the recognized value of information in agency records being used for derivate uses, such as filing "new, targeted FOIA requests."  *See* Pl.'s Mot. at 14–15 (citing *Am. Civil Liberties Union v. Dep't of Justice*, 655 F.3d 1, 15 (D.C. Cir. 2011)).

*Fourth*, Defendant mischaracterizes its treatment of the records at issue to avoid addressing CoA Institute's argument about additional employee-related information withheld under Exemption 6, including information "regarding an identified group of staff concerning job performance," "facility names," and a "description of past projects."  Swailes Decl. Ex. F at 56–58; *see* Pl.'s Mot. at 16.  As for the "group of staff," Defendant offers no real response to CoA Institute and makes no effort to explain how an undifferentiated group has cognizable privacy interests under Exemption 6, which only protects "individuals."  *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982); Def.'s Opp'n at 11–12.  And neither of Defendant's declarants clarify what, exactly, is being withheld.  Next, Defendant tries to deny that it has withheld the identity of a "facility" under Exemption 6.  *See* Def.'s Opp'n at 12.  But the record is clear on this point: "Bates page 423 withheld names, titles, *facility names*, and other personal information of non-VA employees under Exemption 6[.]"  Swailes Decl. Ex. F at 57–58 (emphasis added).  Details about

---

[2] If anything, the fact Defendant contracted the pilot studies "in furtherance of a detailed congressional mandate," Def.'s Opp'n at 11, warrants disclosing as much information as possible— including employee information—because it could be useful in holding the agency to account or during public participation in the national realignment process.  *See* Pl.'s Mot. at 3–4.

a physical building are not protected under Exemption 6 because they are "not associated with any particular individual." *In Def. of Animals v. Nat'l Insts. of Health*, 543 F. Supp. 2d 70, 80 (D.D.C. 2008). Finally, Defendant fails to respond to CoA Institute's argument about descriptions of past VA projects. Defendant again tries to misdirect the Court's attention by claiming it withheld this information under Exemption 5. *See* Def.'s Opp'n at 12. Not so: "Bates page 387 withheld the title of a VA employee, personal information and *description of past projects* under Exemption 6. The title and described projects could be used to directly identify the employees." Swailes Decl. Ex. F. at 56 (emphasis added). Information "does not become personal solely because it identifies government employees." *Aguirre v. Sec. & Exch. Comm'n*, 551 F. Supp. 2d 33, 54 (D.D.C. 2008).

### B.    Provider Productivity Data

Defendant does not directly address its treatment of provider productivity data. *See* Def.'s Opp'n at 12. The agency has neither explained "who (or what) qualifies as a 'provider'" nor has it described the redacted material as personally identifying. Pl.'s Mot. at 16–17. Defendant did not offer any sort of clarification in its opposition brief. Although the agency points to its *Vaughn* index, which suggests it "withheld data linked to provider productivity by specialty under Exemption 6," Swailes Decl. Ex. F at 47, that is a conclusory and self-serving description. It remains unclear what provider productivity data *is* and whether it is *personally identifying*.

### C.    Aggregate Patient Level Data

Defendant's continued insistence that it properly withheld aggregate patient-level data reflects a confusion of how Exemption 6 operates. Defendant argues it "withheld aggregate data because the data could be used to identify an individual" and there is no public interest in disclosure. Def.'s Opp'n at 12. Whether disclosure would serve the public interest ultimately does

not matter because Defendant has not satisfied Exemption 6's *threshold requirement* that information implicate an *individual* privacy interest.

Aggregate data is "unrelated to any particular person" and not protected by Exemption 6. *See Wash. Post Co.* 456 U.S. at 602 & 602 n.4; *In Def. of Animals*, 543 F. Supp. 2d at 80. Defendant offers no caselaw to the contrary and no argument for how further efforts by CoA Institute (or anyone else) could lead to identification of VA patients based on disclosure of non-identifying, aggregate data in the pilot studies.  To the extent courts ever consider potential secondary uses of information, they require a close nexus between the information at hand and cognizable individuals, as well as some explanation for *how* disclosure could lead to an unwarranted invasion of a privacy interest.  *Cf. Am. Civil Liberties Union v. Dep't of Justice*, 655 F.3d 1, 6–7 (D.C. Cir. 2011) (discussing Exemption 7(C)).  Given the lacking description provided by Defendant, any potential privacy interests here are too attenuated to satisfy Exemption 6's threshold requirement.  Defendant has withheld, for example, the "aggregate number of inpatient discharges by county within a state," as well as the "aggregate number of unique patients using a VHA facility," but it is unclear how anyone could backwards-engineer those statistics to identify actual patients.  Swailes Decl. Ex F. at 46–47.  Defendant's *Vaughn* index and declarations provide little clarity on the matter.  The Court should reject Defendant's Exemption 6 claim.

**V.      Defendant has not satisfied its burden under the "foreseeable harm" standard.**

An agency may only "withhold information" under the FOIA "if [it] *reasonably foresees* that disclosure would harm an interest protected by an exemption[.]"  5 U.S.C. § 552(a)(8)(A)(i)(I) (emphasis added); *see, e.g.*, *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018).  It is not enough that an agency merely recites "boiler plate language to justify [its] redactions." *Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019); *see Machado*

13

*Amadis v. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020).   With both Exemption 5 and

Exemption 6, Defendant has not satisfied its burden to justify withholding the records at issue.

### A.    Exemption 5

Defendant's foreseeable harm analysis is deficient.   The agency "failed to offer *factual*

*support* for the supposed harms" described by its declarants, confused the pilot studies with the

ongoing market assessments, and did not consider the effect of the MISSION Act, given that it

opened the realignment process to public participation.  Pl.'s Mot. at 19–20.  Defendant's vague

references to "obstacles" and "resistance" is more a "'generic and nebulous articulation[] of harm'"

than something reasonably expected to come to pass.  Pl.'s Mot. at 20–21 (citing *Judicial Watch,*

*Inc. v. Dep't of Justice*, No. 17-0832, 2019 WL 4644029, at *5 (D.D.C. Sept. 24, 2019)).

Defendant failed to respond to any of these points.   It instead inserted into its brief a

lengthy, three-paragraph block quote from Ms. Stuppy's declaration.  *See* Def.'s Opp'n at 7–8.

That is hardly a substantive rebuttal.[3]   And Defendants passing reference to *Machado Amadis* for

the proposition that an agency meets its burden so long as its supporting declaration "focuse[s] on

the information at issue," Def.'s Opp'n at 8, is not enough to strengthen its anemic reply.   Even

after the D.C. Circuit's decision in *Machado Amadis*, an agency must "substantiate its claims of

foreseeable harm."  *Sierra Club*, 2021 WL 765727, at *8.  Defendant has not done that.  The Court

should treat the inadequacy of Defendant's Exemption 5 "foreseeable harm" analysis as conceded

in CoA Institute's favor.  *Cf. Pinson v. Dep't of Justice*, 177 F. Supp. 3d 56, 81 (D.D.C. 2016).

---

[3] Courts have rejected significant block quotes as inadequate argument, particularly when they fail to raise new points. *Cf. Williams v. Johanns*, No. 03-2245, 2005 WL 8177881, at *4 (D.D.C. Oct. 24, 2005).

## B.    Exemption 6

The story is no different for Exemption 6.  "Defendant cannot rely on its argument for *technical application* of Exemption 6" to satisfy the "foreseeable harm" standard.  Pl.'s Mot. at 21.  That standard "requires meaningful and independent analysis *beyond* establishing a substantial privacy interest and the likelihood of an unwarranted invasion of personal privacy." *Id.*  Defendant has not addressed these points.  In its opposition, the agency instead provides a conclusory argument that its declarant's "statements meet the heightened standard" because they "focused on the information at issue."  Def.'s Opp'n at 13 (citing *Machado Amadis*, 917 F.3d at 370–71).  But, as with Exemption 5, the D.C. Circuit's decision in *Machado Amadis* does not excuse an agency from "substantiat[ing] its claims of foreseeable harm."  *Sierra Club*, 2021 WL 765727, at *8.  This is especially so when there is little factual support for allegations that disclosure could lead to harassment or threats of violence.  *See supra* at p. 10 (Defendant's reference to news articles).

## VI.    Defendant did not segregate and release non-exempt portions of responsive records.

Defendant must release "any segregable portion of a record . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b); *see id.* § 552(a)(8)(A)(ii)(II).  Defendant has failed to defend the reasonableness of its effort to release segregable portions of the pilot studies and briefing documents.  *See* Pl.'s Mot. at 22–23.  Defendant's counterarguments fail.

*First*, Defendant has provided no support for its categorical application of Exemption 5. Relevant caselaw requires an agency to "explain in detail" why factual and deliberative material are "inextricably intertwined."  *Edmonds Inst. v. Dep't of the Interior*, 383 F. Supp. 2d 105, 108 (D.D.C. 2005).  A supporting declaration or other "submission that does not do that does not even qualify as a 'Vaughn index.'"  *Schiller v. Nat'l Labor Relations Bd.*, 964 F.2d 1205, 1210 (D.C. Cir. 1992), *abrogated on other grounds*, *Milner v. Dep't of the Navy*, 562 U.S. 562 (2011).  A

handful of conclusory sentences in one of Defendant's declarations cannot carry the day. *See* Swailes Decl. ℙℙ 21 & 23.

*Second*, Defendant misapprehends the relevance of its previous over-redaction of the pilot studies and its decision to re-release records concurrent with its motion for summary judgment. *See* Def.'s Opp'n at 15–16. As CoA Institute explained, the agency's supplemental production makes it "reasonable to remain skeptical of Defendant's continued withholding of hundreds of pages of responsive records in full." Pl.'s Mot. at 23. "Given FOIA's prodisclosure purposes . . . a less stringent standard" is needed to challenge the "presumption of legitimacy accorded to the Government's official conduct[.]" *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 159 (2003). Defendant's own actions are sufficient evidence "to warrant a belief by a reasonable person" that the agency continues to improperly withhold records. *Id.*[4] Defendant failed to respond to this this line of argument.

*Third*, Defendant continues to confuse when it may withhold otherwise segregable material that it finds "meaningless." CoA Institute set forth the relevant standard its cross-motion. *See* Pl.'s Mot. at 23 (citing *Nat'l Sec. Archive Fund, Inc. v. Cent. Intelligence Agency*, 402 F. Supp. 2d 211, 220–21 (D.D.C. 2005)). Defendant now recognizes this standard but provides no evidence that it has met it. The agency instead points to its declarant's claim that partial disclosure could "be misleading or misinterpreted." Def.'s Opp'n at 16 (citing Swailes Decl. ℙ 21). Even taking that claim as true, it does not follow that disclosure of non-exempt information, which would otherwise be misleading or open to misinterpretation, would consist of "isolated meaningless words." If anything, the fact that disclosure of portions of records could be misleading or

---

[4] Defendant's lack of awareness that it withheld certain information under Exemption 6 is likewise damning. *See supra* at pp. 11–12. If Defendant does not even know the content of its own *Vaughn* index, it seems unlikely that it is familiar with the actual content of the records at issue.

misinterpreted suggests that those portions are *substantive* and not "incomplete, fragmented, or unintelligible."  Defendant deserves no presumption to the contrary.

## VII.      Defendant failed to respond to CoA Institute's request for *in camera* review.

Defendant failed to respond to CoA Institute's request for *in camera* review.  *See* Pl.'s Mot. at 23–25.  "[D]istrict courts have 'broad discretion' to decide whether *in camera* review is necessary to determine whether the government has met its burden[.]"  *Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008).

Here, *in camera* review would be apt because the agency has not offered satisfactory justifications for its application of Exemption 5.  It continues to confuse the different decision-making processes involved in the overarching VA reform process contemplated by Congress.  It offers conclusory explanations for the use of Exemption 6, especially as it pertains to information that is not individually identifying.  *See Quiñon v. Fed. Bureau of Investigation*, 86 F.3d 1222, 1229 (D.C. Cir. 1996).  Defendant even fails to recognize its use of Exemption 6 to cover such information as "facility names" and "description[s] of past projects."  *See supra* at pp. 11–12.

*In camera* review would not be onerous.  There are only seven records at issue.  *See People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 307 (D.D.C. 2007).  And given the relative similarity between each of the pilot studies and accompanying briefing documents, the Court could alternatively order Defendant to submit a single report and briefing document as a representative sample.  This would serve judicial economy.  *See Carter v. Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987).

The Court should order Defendant to submit *ex parte* unredacted versions of the records at issue for the Court's *in camera* consideration.

17

**CONCLUSION**

For these reasons, CoA Institute respectfully requests that the Court deny Defendant's motion for summary judgment and grant CoA Institute's cross-motion for summary judgment. CoA Institute also requests that the Court order Defendant to re-process and produce all responsive records in their entirety within the next twenty days.

Dated: March 26, 2021                    Respectfully submitted,

                                         /s/ Ryan P. Mulvey
                                         Ryan P. Mulvey
                                         (D.C. Bar No. 1024362)

                                         CAUSE OF ACTION INSTITUTE
                                         1310 North Courthouse Road, Suite 700
                                         Arlington, VA 22201
                                         Telephone: (571) 482-4182
                                         ryan.mulvey@causeofaction.org

                                         *Counsel for Plaintiff CoA Institute*

18