**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAUSE OF ACTION INSTITUTE, | |
| Plaintiff, | |
| v. | Civil Action No. 20-997 (BAH) |
| U.S. DEPARTMENT OF VETERANS AFFAIRS, | Chief Judge Beryl A. Howell |
| Defendant. | |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Cause of Action Institute ("COA"), a "non-profit strategic oversight group advocating for economic freedom and individual opportunity advanced by honest, accountable, and limited government," Compl. ¶ 6, ECF No. 1, challenges the response of defendant, the U.S. Department of Veterans Affairs ("VA"), to a request submitted pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for records related to pilot market assessments created by a VA contractor in preparation for VA's implementation of the congressionally mandated Market Area Health System Optimization ("MAHSO") analysis, part of a broader national plan to improve the delivery of health care to veterans, *see* Compl., Ex. 1, Letter from John E. McGlothlin, Counsel, COA, to VA FOIA Service (Jan. 16, 2019) ("FOIA Request"), ECF No. 1-1. Specifically, plaintiff alleges in a single claim that VA unlawfully withheld records responsive to plaintiff's FOIA Request. Compl. ¶¶ 24–30; *see also* Pl.'s Mem. P. & A. Opp'n Def.'s Mot. Summ. J. & Supp. Pl.'s Cross-Mot. Summ. J. ("Pl.'s Opp'n") at 1, ECF No. 17-1.

Pending before the Court are the parties' cross-motions for summary judgment. Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 16; Pl.'s Opp'n Def.'s Mot. Summ. J. & Cross-Mot.

Summ. J. ("Pl.'s Mot."), ECF No. 17.  For the reasons set forth below, VA's Motion for

Summary Judgment is granted and plaintiff's Cross-Motion for Summary Judgment is denied.

## I.      BACKGROUND

Pertinent background underlying plaintiff's FOIA Request is briefly described, followed

by review of the FOIA Request and VA's responses thereto, both before and after initiation of

this lawsuit.

### A.      Pertinent Background

"VA maintains a complex of medical facilities dedicated to Veteran health care that is

managed by the Veterans Health Administration (VHA)," including "approximately 140 [VA]

Medical Centers and nearly 1700 outpatient centers," as well as Residential Treatment Facilities

and Community Living Centers.  Def.'s Mot., Ex. 2, Decl. of Christine M. Stuppy, MBA

("Stuppy Decl.") ¶ 4, ECF No. 16-3.  VA's facilities are organized into eighteen geographic

regions, "known as Veterans Integrated Services Networks (VISNs)," that together "serve 96

geographic markets."  *Id.*  In December 2014, Congress directed that the Secretary of VA

develop and deliver to Congress "a report including . . . a national realignment strategy that

includes a detailed description of realignment plans within each [VISN], including an updated

Long Range Capital Plan to implement realignment requirements" (the "National Realignment

Strategy").  Consolidated and Further Continuing Appropriations Act, 2015 ("2015 Act"), Pub.

L. No. 113-235, § 235, 128 Stat. 2130, 2566 (2014); *see also* Stuppy Decl. ¶ 5.  The report was

also required to provide "an explanation of the process by which" VA developed its National

Realignment Strategy and "a cost vs. benefit analysis of each planned realignment."  2015 Act

§ 235.

The VA MISSION Act of 2018 ("MISSION Act"), Pub. L. No. 115-182, 132 Stat. 1393

(2018), imposed additional procedural requirements on VA's development of its realignment

strategy, *see id.* tit. II, subtit. A, § 203, 132 Stat. at 1446.  This statute obligates the VA Secretary to "publish in the Federal Register and transmit to the Committees on Veterans' Affairs of the Senate and the House of Representatives" the proposed and final criteria "to be used by [VA] in assessing and making recommendations regarding the modernization or realignment of [VHA] facilities." *Id.* § 203(a)(1); *see also id.* § 203(a)(3).  The deadline for publication of the final criteria is May 31, 2021.  *Id.* § 203(a)(3).  By January 31, 2022, the Secretary must "publish in the Federal Register and transmit," *id.* § 203(b)(1), to Congress and the Asset and Infrastructure Review Commission ("AIR Commission") created by the MISSION Act, *see id.* § 202, "a report detailing the recommendations regarding the modernization or realignment of facilities of the [VHA] on the basis of the final criteria" previously submitted by the agency, *id.* § 203(b)(1). The MISSION Act sets out a list of "factors" that the Secretary must consider in making recommendations, *id.* § 203(b)(2), and requires the agency to "assess the capacity of each [VISN] and medical facility . . . to furnish hospital care or medical services," including through "a commercial health care market assessment of designated catchment areas . . . conducted by a non-governmental entity" and "consult[ation] with veterans service organizations and veterans," *id.* § 203(b)(3), which assessments must be submitted with the agency's recommendations, *id.* § 203(c), but does not otherwise limit VA's discretion to develop its recommendations.

Upon submission, the agency's recommendations will be subject to review by the AIR Commission, *see id.*, which may only change the recommendations if, among other mandatory findings, it "determines that the Secretary deviated substantially from the final criteria published by VA, *id.* § 203(c)(2)(B)(i).  By the end of January 2023, the AIR Commission will "transmit to the President a report containing [its] findings and conclusions based on a review and analysis of the recommendations made by the Secretary, together with the Commission's

recommendations." *Id.* § 203(c)(2)(A).  Within two weeks of receiving the report, by February 15, 2023, the President must "transmit to the Commission and to the Congress a report containing the President's approval or disapproval of the Commission's recommendations," *id.* § 203(d)(1), and VA then "shall begin to implement" the approved recommendations, *id.* § 204(a).

VA determined that, to formulate its National Realignment Strategy, a study was necessary of all ninety-six VISN markets, known as the MAHSO analysis.  Stuppy Decl. ¶ 5. The agency entered a contract with PricewaterhouseCoopers ("PWC"), an outside consulting firm, "to develop a uniform methodology to perform market assessments . . . on healthcare markets within the VISNs," with the goal of generating "a consistent method of conducting market assessments across all 96 [VISN] markets" (the "market assessment methodology").  *Id.* ¶ 6.  This contract (the "Pilot Study Contract") was assigned VA Contract No. VA101F-17-C-2843.  *See id.*; Def.'s Mot., Ex. 1, Decl. of Barbara Swailes ("Swailes Decl.") ¶ 15, ECF No. 16-2.  As part of the contract, PWC was to test the market assessment methodology "in three diverse markets by conducting pilot market assessments."  Stuppy Decl. ¶ 6.  PWC completed the three pilot market assessments, which utilized an "eight-step draft methodology," *id.* ¶ 8, in Spring 2017 and provided to VA "deliverables that memorialized the work," consisting of the three pilot market assessments and a briefing document on each assessment, *id.* ¶ 7; *see also* Swailes Decl. ¶¶ 13, 15.

### B.    The FOIA Request

On January 16, 2019, plaintiff submitted the FOIA Request at issue to VA.  FOIA Request at 1; Def.'s Statement of Material Facts Not in Genuine Dispute ("Def.'s SMF") ¶ 1, ECF No. 16-4; Pl.'s Statement of Undisputed Material Facts ("Pl.'s SMF") ¶ 1, ECF No. 17-2. The Request sought "[a]ll records, including but not limited to email communications and

reports, relating to the results of The Pilot Study Contract (VA Contract No. VA101F-17-C-2843)." FOIA Request at 1. The Request included in its scope "any information produced by the Department of Veterans Affairs or provided by the contractor conducting the pilot studies, which were designed to define processes and outputs for an 'ideal healthcare delivery system,'" from "December 6, 2016 to the present." *Id*. VA received the FOIA Request that same day and assigned it a tracking number. Swailes Decl. ¶ 5; Def.'s SMF ¶ 1.

### C.     Processing of the Request and Procedural History

The FOIA Request was initially referred to the VA Office of Procurement Policy Services' FOIA Office for processing, Swailes Decl. ¶ 5, and in February 2019, that office informed plaintiff that it had forwarded the FOIA Request to the VA Construction Facility and Management ("CFM") FOIA Office "for file search and direct response" to plaintiff," *id*. ¶ 6; *see also id.*, Ex. B, Email from Patricia Litewski, FOIA Officer, Procurement Policy Services, VA, to John McGlothlin, Counsel, COA (Feb. 15, 2019, 9:54 AM), ECF No. 16-2; Pl.'s SMF ¶ 6; Def.'s Resp. Pl.'s Statement of Undisputed Material Facts ("Def.'s Resp. SMF") ¶ 6, ECF No. 19-1. The CFM FOIA Office soon determined that the Pilot Study Contract had been handled by VHA rather than CFM, and thus transferred the FOIA Request to the VHA Central Office FOIA Office ("VHA FOIA Office") for further processing. Swailes Decl. ¶ 7. Plaintiff was informed of the transfer in March 2019. *Id*. ¶¶ 8, 9; *see also id.*, Ex. C, Letter from Michael B. Sarich, Director, VHA FOIA Off., to John McGlothlin, Counsel, COA (Mar. 8, 2019), ECF No. 16-2; *id.*, Ex. D, Letter from Michael B. Sarich, Director, VHA FOIA Off., to John McGlothlin, Counsel, COA (Mar. 15, 2019), ECF No. 16-2.

At the time of the transfer, the VHA FOIA Officer sent record search inquiries to VHA's Office of Policy and Planning ("OPP"), Office of Healthcare Transformation ("OHT"), and Office of Capital Asset Management, Engineering, and Support ("OCAMES"). Swailes Decl.

¶ 10.  OHT "responded by indicating that" the Pilot Study Contract "was not an OHT contract," and OCAMES "request[ed] that the record search be directed to OPP due to OPP's involvement with the market assessment project."  *Id.*  As of June 2019, the FOIA Officer had not received any response from OPP.  *Id.*  Nearly a year later, on April 14, 2020, having received no communications from VA since March 2019, plaintiff requested a status update on the processing of the FOIA Request.  *Id.* ¶ 11.  The VHA FOIA Officer responded to plaintiff on the same day and "provided the end of the calendar year 2020 as an estimated date of completion."  *Id.*  Two days later, on April 16, 2020, plaintiff initiated this litigation.  *See* Compl.; Pl.'s SMF ¶ 8; Def.'s Resp. SMF ¶ 8.

Two weeks after the filing of the instant Complaint, OPP informed the FOIA Officer that it had produced some potentially responsive documents in response to a previous FOIA request for the pilot market assessments.  Swailes Decl. ¶ 10.  The FOIA Officer tracked down "the responsive documents" identified pursuant to that request, consisting of "seven documents, totaling four hundred and eighty-nine . . . pages, [B]ates numbered 1-489."  *Id.*  The seven documents included the three pilot market assessments, with one of the three studies split into two files, and three related briefing documents, all prepared by PWC in consultation with VA employees pursuant to the Pilot Study Contract.  *See id.*; *id.*, Ex. F, Vaughn Index FOIA Request 19-05023-F ("*Vaughn* Index") at 1–24, ECF No. 16-2.

On May 11, 2020, the VHA FOIA Officer issued VA's first Initial Agency Decision (the "First IAD"), addressing these seven documents, to plaintiff.  *Id.* ¶ 13; *id.*, Ex. E, Letter from Barbara Swailes, VHA FOIA Officer, VHA FOIA Off., to John E. McGlothlin, Counsel, COA (May 11, 2020) ("First IAD") at 2, ECF No. 16-2; Def.'s SMF ¶ 3(a); Pl.'s Resp. SMF ¶ 3; Pl.'s SMF ¶¶ 10–11; Def.'s Resp. SMF ¶¶ 10–11.  All 489 pages were withheld in full pursuant to the

deliberative process privilege of FOIA Exemption 5, with certain overlapping withholdings under FOIA Exemption 6.  First IAD at 2–7; *see also* Swailes Decl. ¶ 13; Def.'s SMF ¶ 3(a); Pl.'s Resp. SMF ¶ 3; Pl.'s SMF ¶¶ 11–12; Def.'s Resp. SMF ¶¶ 11–12.  As reflected in the parties' first Joint Status Report to the Court, VA agreed to produce a *Vaughn* Index corresponding to the First IAD to plaintiff, *see* Joint Status Report (June 3, 2020) at 1, ECF No. 10, and did so in June 2020, Swailes Decl. ¶ 24.[1]

Between June 2020 and September 2020, the VHA FOIA Officer searched for additional materials responsive to the FOIA Request.  Swailes Decl. ¶ 25; *see also* Joint Status Report (Aug. 3, 2020) at 1–2, ECF No. 11.  The FOIA Officer issued two further IADs during this period, in August and September.  Swailes Decl. ¶ 25; Pl.'s SMF ¶¶ 15–16; Def.'s Resp. SMF ¶¶ 15–16; Joint Status Report (Sept. 4, 2020) ("Sept. 4 JSR") at 1, ECF No. 12.  After realizing that these two IADs addressed duplicate documents, Swailes Decl. ¶ 25, the parties "agreed to narrow the scope of summary judgment to those responsive records identified in" the First IAD, Pl.'s SMF ¶ 17; *see also* Def.'s Resp. SMF ¶ 17.  Their next status report advised the Court that "[p]laintiff d[id] not contest the adequacy of the search but intend[ed] to challenge [VA]'s withholding of certain pilot studies and related records under Exemptions 5 and 6," and that the parties therefore "believe[d] that briefing on summary judgment [was] necessary."  Joint Status Report (Sept. 25, 2020) ("Sept. 25 JSR") at 1, ECF No. 13.  A schedule for dispositive motions was accordingly set.  *See* Min. Order (Sept. 28, 2020); Min. Order (Dec. 8, 2020).

On December 14, 2020, less than a month before its Motion for Summary Judgment was due, *see* Min. Order (Dec. 8, 2020), VA "issued a notification letter" to plaintiff "as a follow-up" to the First IAD.  Swailes Decl. ¶ 26; *see also* Pl.'s SMF ¶ 18; Def.'s SMF ¶ 18.  This letter

---

[1]      "A *Vaughn* index describes the documents withheld or redacted [by the agency] and the FOIA exemptions invoked, and explains why each exemption applies."  *Prison Legal News v. Samuels*, 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015).

advised that the agency "had determined that the eight-step methodology" used in the three pilot

market assessments "could be released."  Swailes Decl. ¶ 26.  The VHA FOIA Officer

accordingly "re-reviewed" the 489 pages that had been withheld in the First IAD "and released

the five pages containing the methodology in full," as well as "additional pages that repeated

methodology information."  *Id.*  She further "determined that [the agency] could release several

pages that had essentially no substantive content and release of which would not harm the

agency."  *Id.*  As a result of this second review of the First IAD, "[a] total of thirty-eight . . .

pages" previously withheld "were released in full or in part," *id.*, but VA continued to withhold

in full the remaining 451 pages.  The agency also produced to plaintiff a revised *Vaughn* Index.

*Id.*; *see also Vaughn* Index.  The parties' briefing continued on the basis of the revised First IAD,

and the pending cross-motions for summary judgment became ripe for resolution on March 26,

2021.  *See* Pl.'s Reply Br. Supp. Pl.'s Cross-Mot. Summ. J. ("Pl.'s Reply"), ECF No. 21.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "'[a] party is entitled to summary judgment

only if there is no genuine issue of material fact and judgment in the movant's favor is proper as

a matter of law.'"  *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006));

*see also* Fed. R. Civ. P. 56(a).  "'In FOIA cases, summary judgment may be granted on the basis

of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory

statements, and if they are not called into question by contradictory evidence in the record or by

evidence of agency bad faith.'"  *Aguiar v. DEA*, 865 F.3d 730, 734–35 (D.C. Cir. 2017) (quoting

*Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013)); *see also Students*

*Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) ("[A]n agency is entitled

to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly exempt from the Act's inspection requirements.'" (omission in original) (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978))).  Most FOIA cases "can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

FOIA was enacted "to promote the 'broad disclosure of Government records' by generally requiring federal agencies to make their records available to the public on request." *DiBacco v. U.S. Army* ("*DiBacco I*"), 795 F.3d 178, 183 (D.C. Cir. 2015) (quoting *Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)).  Agencies are therefore statutorily mandated to "make . . records promptly available to any person" who submits a request that "reasonably describe such records" and "is made in accordance with [the agency's] published rules." 5 U.S.C. § 552(a)(3)(A).  To balance the public's interest in governmental transparency and "'legitimate governmental and private interests [that] could be harmed by release of certain types of information,'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 913 F.3d 1106, 1108 (D.C. Cir. 2019) (quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982)), FOIA contains nine exemptions, set forth in 5 U.S.C. § 552(b), which "are 'explicitly made exclusive' and must be 'narrowly construed,'" *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (first quoting *EPA v. Mink*, 410 U.S. 73, 79 (1979); and then quoting *Abramson*, 456 U.S. at 630); *see also Murphy v. Exec. Off. for U.S. Att'ys*, 789 F.3d 204, 206 (D.C. Cir. 2015); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW*"), 746 F.3d 1082, 1088 (D.C. Cir. 2014).  "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

FOIA authorizes federal courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). When an agency invokes an exemption to disclosure, district courts must "determine *de novo* whether non-disclosure was permissible." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015). The statute "places the burden 'on the agency to sustain its action,' and the agency therefore bears the burden of proving that it has not 'improperly' withheld the requested records." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice*, 922 F.3d 480, 487 (D.C. Cir. 2019) (first quoting 5 U.S.C. § 552(a)(4)(B); and then quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989)); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) ("The Government bears the burden of establishing that the exemption applies."); *DiBacco v. U.S. Dep't of Army* ("*DiBacco II*"), 926 F.3d 827, 834 (D.C. Cir. 2019) ("'An agency withholding responsive documents from a FOIA release bears the burden of proving the applicability of clamed exemptions,' typically through affidavit or declaration." (quoting *DiBacco I*, 795 F.3d at 195)). This burden does not shift even when the requester files a cross-motion for summary judgment because the agency ultimately "bears the burden to establish the applicability of a claimed exemption to any records or portions of records it seeks to withhold," *Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 673 (D.C. Cir. 2016), while "[t]he burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur,'" *Pub. Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999) (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

## III.    DISCUSSION

Plaintiff contests VA's invocation of Exemptions 5 and 6 to justify withholding of all but thirty-eight pages of the seven documents identified in the First IAD and its redactions from twenty-two of the thirty-eight produced pages.  *See* Pl.'s Opp'n at 6–18; Pl.'s Reply at 5–13. Additionally, plaintiff disputes VA's foreseeable harm and segregability analyses with respect to its withholdings.  *See* Pl.'s Opp'n at 18–23; Pl.'s Reply at 13–17.[2]  These topics are addressed *seriatim*.[3]

### A.    Application of FOIA Exemptions

FOIA "requires government agencies to make information available upon request, unless the information is protected by one of" FOIA's nine exemptions.  *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 738 (D.C. Cir. 2017).  An agency must prove the applicability of claimed exceptions, and can do so through a *Vaughn* index, and supporting affidavits or declarations, that "describe[] the justifications for withholding the information with specific

---

[2]    VA discusses at length the adequacy of its search for records responsive to the FOIA Request, *see* Def.'s Mem. P. & A. Supp. Def.'s Mot. Summ. J. ("Def.'s Mem.") at 5–8, ECF No. 16-1; Def.'s Reply Mem. Supp. Def.'s Mot. Summ. J. & Resp. Opp'n Pl.'s Mot. Summ. J. ("Def.'s Reply") at 1–2, ECF No. 19, even though, as explained *supra* Part I.C, the parties agreed to restrict the scope of summary judgment to the propriety of VA's withholdings under Exemptions 5 and 6, *see* Sept. 25 JSR at 1, and plaintiff maintains, consistent with the parties' previous representation to the Court, that "the sufficiency of [VA]'s search" for responsive records "is not in dispute," Pl.'s Opp'n at 7 n.3; *see also* Pl.'s Reply at 1–2.  Indeed, plaintiff's Complaint nowhere alleges that VA's search was inadequate.  *See* Compl.  Accordingly, the adequacy of VA's search is not contested and will not be addressed any further.  *See, e.g.*, *Niskanen Ctr. v. FERC*, 436 F. Supp. 3d 206, 212–13 (D.D.C. 2020); *Tipograph v. Dep't of Justice*, 83 F. Supp. 3d 234, 238 (D.D.C. 2015); *Showing Animals Respect & Kindness v. U.S. Dep't of Interior*, 730 F. Supp. 2d 180, 190 (D.D.C. 2010).

[3]    Plaintiff requests that the Court "order [VA] to submit unredacted versions of the records at issue" for *in camera* review, Pl.'s Opp'n at 25, arguing that such review is warranted "[b]ased on . . . [VA's] improper use of Exemptions 5 and 6, as well as [the agency's] questionable efforts to segregate non-exempt portions of records for release," *id.* at 24; *see also id.* at 23–25; Pl.'s Reply at 17.  FOIA provides that a district court "may examine the contents of . . . agency records in camera" at its discretion, 5 U.S.C. § 552(a)(4)(B), "but 'it by no means compels the exercise of that option,'" *Larson v. Dep't of State*, 565 F.3d 857, 869 (D.C. Cir. 2009) (quoting *Juarez v. Dep't of Justice*, 518 F.3d 54, 60 (D.C. Cir. 2008)).  "'If the agency's affidavits provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents.'"  *Mobley v. CIA*, 806 F.3d 568, 588 (D.C. Cir. 2015) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 626 (D.C. Cir. 2011)).  As explained below, the first two of these requirements are satisfied in the instant case, and plaintiff raises no allegations of agency bad faith.  *In camera* review therefore will not be ordered.

detail, demonstrate[] that the information withheld logically falls within the claimed exemption, and [are] not contradicted by contrary evidence in the record or by evidence of the agency's bad faith." *DiBacco II*, 926 F.3d at 834 (internal quotation marks and citation omitted); *see also, e.g.*, *CREW*, 746 F.3d at 1088; *Poitras v. Dep't of Homeland Sec.*, 303 F. Supp. 3d 136, 150 (D.D.C. 2018) ("An agency may carry its burden of showing an exemption was properly invoked by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld and provided sufficient information as to the applicability of an exemption to enable the adversary system to operate."). "'Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (quoting *ACLU*, 628 F.3d at 619).

Plaintiff disputes VA's assertion of Exemption 5's deliberative process privilege as to the agency's withholding of 451 full pages of the pilot market assessments and related briefing documents discussed in the First IAD and redactions from an additional twenty-two pages of these seven documents. *See Vaughn* Index at 1–24; Pl.'s Opp'n at 8–11; Pl.'s Reply at 5–8. It further contests VA's overlapping claim that Exemption 6 shields from disclosure thirty-five pieces of potentially personally identifying information, for which the agency also cites Exemption 5. *See Vaughn* Index at 1, 4–5, 7–9, 11–13, 14–16, 17–18, 21–23; Pl.'s Opp'n at 11–18; Pl.'s Reply at 8–13. To justify its withholdings from the seven documents, VA need only show that one exemption applies to each withholding. *See Judicial Watch, Inc.*, 715 F.3d at 940; *Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003) (noting that a court "need not address [any] other exemptions invoked" for a withholding justified by one exemption); *Cause of Action Inst. v. Exp.-Imp. Bank of U.S.*, Civ. A. No. 19-1915 (JEB), 2021

WL 706612, at *3 (D.D.C. Feb. 23, 2021).  As explained below, VA has properly relied on Exemption 5 to withhold or redact information from the three pilot market assessments and the three related briefing documents, and the applicability of Exemption 6 therefore need not be considered.

### 1.  *Legal Standards Governing Application of Exemption 5*

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "'Among th[e] privileges protected by Exemption 5 is the . . . deliberative process privilege.'"  *Judicial Watch, Inc.*, 847 F.3d at 739 (alteration and omission in original) (quoting *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982)); *see also Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015).  "To protect agencies from being 'forced to operate in a fishbowl,' the deliberative process privilege shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.* ("*Sierra Club*"), 141 S. Ct. 777, 785 (2021) (first quoting *Mink*, 410 U.S. at 87; and then quoting *NLRB v. Sears, Roebuck & Co.* ("*Sears*"), 421 U.S. 132, 150 (1975)).  It "is rooted in 'the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news.'"  *Id.* (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001)); *see also Judicial Watch, Inc.*, 847 F.3d at 739 (noting that the deliberative process privilege is predicated on the theory that "agencies craft better rules when their employees can spell out in writing the pitfalls as well as the strengths of policy options, coupled with the understanding that employees would be chilled from such rigorous deliberation if they feared it might become public").  The privilege is intended "[t]o encourage candor, which

13

improves agency decisionmaking," by "blunt[ing] the chilling effect that accompanies the prospect of disclosure." *Sierra Club*, 141 S. Ct. at 785; *see also Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (finding the deliberative process privilege intended to "protect[] 'debate and candid consideration of alternatives within an agency,' thus improving agency decisionmaking") (quoting *Jordan v. Dep't of Justice*, 591 F.2d 753, 772 (D.C. Cir. 1978) (en banc))).

"To qualify for the deliberative process privilege, an intra-agency memorandum must be both pre-decisional and deliberative." *Abtew*, 808 F.3d at 898 (citing *Coastal States Gas Corp. v. Dep't of Energy* ("*Coastal States*"), 617 F.2d 854, 866 (D.C. Cir. 1980)); *see also Hall & Assocs. v. EPA*, 956 F.3d 621, 624 (D.C. Cir. 2020).[4]   The Supreme Court recently clarified the contours of these requirements in *U.S. Fish and Wildlife Service v. Sierra Club, Inc.* ("*Sierra Club*"), 141 S. Ct. 777 (2021), finding that "[t]he privilege . . . distinguishes between predecisional, deliberative documents, which are exempt from disclosure, and documents reflecting a final agency decision and the reasons supporting it, which are not," *id.* at 785–86. "Documents are 'predecisional' if they were generated before the agency's final decision on the

---

[4]    At the outset, an agency can claim the deliberative process privilege only with respect to "inter-agency or intra-agency memorandums or letters." 5 U.S.C. § 552(b)(5).  The D.C. Circuit "has . . . interpreted the phrase 'intra-agency' in Exemption 5 to go beyond the text and include U.S. agency records authored by *non*-agency entities if those records were solicited by a U.S. agency in the course of its deliberative process" and were created by "an outside consultant" who "did not have its own interests in mind." *Pub. Emps. for Env'tl Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 201–02 (D.C. Cir. 2014) (citing *McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d 331, 336–37 (D.C. Cir. 2011)); *see also Nat'l Inst. of Mil. Justice v. U.S. Dep't of Def.*, 512 F.3d 677, 679–80 (D.C. Cir. 2008); *Buzzfeed, Inc. v. FBI*, Civ. A. No. 18-cv-2567 (BAH), 2020 WL 2219246, at *6 (D.D.C. May 7, 2020). This interpretation, known as the "consultant corollary" to Exemption 5, brings agency "communications to or from non-governmental parties, including contractors," within the scope of the exemption as intra-agency documents, so long as "'the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it.'" *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 185 (D.D.C. 2017) (quoting *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 892 F. Supp. 2d 28, 45 (D.D.C. 2012)).  Though plaintiff "objects to the foundational confusion and lack of textual support undergirding the D.C. Circuit's prevailing precedent, and the obvious inconsistency of the consultant corollary with the plain meaning of Exemption 5's unambiguous language," it does not contest that, under this Circuit's binding precedent upholding and applying the consultant corollary, VA "has technically satisfied Exemption 5's threshold requirement" that a record be an inter-agency or intra-agency communication.  Pl.'s Opp'n at 8 n.3.  The parties therefore do not dispute that the contested records qualify as "intra-agency" documents.  *See* Def.'s Mem. at 9; Pl.'s Opp'n at 8 n.3.

matter, and they are 'deliberative' if they were prepared to help the agency formulate its

position." *Id.* at 786 (citing *Sears*, 421 U.S. at 150–52; *Renegot. Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184–86, 190 (1975)); *see also Judicial Watch, Inc.*, 847 F.3d at 739

("Documents are 'predecisional' if they are 'generated before the adoption of an agency policy,'

and 'deliberative' if they 'reflect[] the give-and-take of the consultative process.'" (alteration in

original) (quoting *Pub. Citizen, Inc. v. Off. of Mgmt. & Budget*, 598 F.3d 865, 874 (D.C. Cir.

2010))).  "There is considerable overlap between these two prongs because a document cannot

be deliberative unless it is predecisional." *Sierra Club*, 141 S. Ct. at 786.

*Sierra Club* explains that "a court must evaluate the documents 'in the context of the

administrative process which generated them'" to decide whether a document represents an

agency's final decision.  *Id.* (quoting *Sears*, 421 U.S. at 138).  "[D]etermining whether an

agency's position is final for purposes of the deliberative process privilege is a functional rather

than formal inquiry," *id.* at 788, that focuses on "whether [the record] communicates a policy on

which the agency has settled," *id.* at 786.  To answer this question, "courts must consider

whether the agency treats the document as its final view on the matter."  *Id.* (citing *Sears*, 421

U.S. at 161).  "[O]nce cited as the agency's final view, the document reflects 'the consummation

of the agency's decisionmaking process' and not a 'merely tentative position,'" and therefore

loses the protection of Exemption 5.  *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78

(1997)).  On the other hand, "a document that leaves agency decisionmakers 'free to change their

minds' does not reflect the agency's final decision" and is exempt from disclosure.  *Id.* (quoting

*Grumman Aircraft Eng'g Corp.*, 421 U.S. at 189–90 & n.26).  A record's "real operative effect"

is probative of its finality, but is assessed by reference "to the legal, not practical, consequences

that flow from an agency action."  *Id.* at 787 (citing *Sears*, 421 U.S. at 159 n.25, 160).  Thus, a

document that reflects an agency view "that [is] subject to change," *id.* at 786, may be exempt as predecisional and deliberative even if it in fact "has the effect of changing an agency's course," *id.* at 788.

To show that the deliberative process privilege is properly invoked, the government must explain, for each withheld record, at a minimum "(1) 'what deliberative process is involved,' (2) 'the role played by the documents in issue in the course of that process,' and (3) 'the nature of the decisionmaking authority vested in the office or person issuing the disputed document[s], and the positions in the chain of command of the parties to the documents.'" *Ctr. for Biological Diversity v. EPA*, 279 F. Supp. 3d 121, 147 (D.D.C. 2017) (alteration in original) (first quoting *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585–86 (D.C. Cir. 1987); and then quoting *Elec. Frontier Found. v. U.S. Dep't of Justice*, 826 F. Supp. 2d 157, 168 (D.D.C. 2011)); *see also Ecological Rights Found. v. EPA*, Civ. A. No. 19-980 (BAH), 2021 WL 535725, at *12 (D.D.C. Feb. 13, 2021). "The government, not the requester, must identify the deliberative process to which any record relates." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 101 (D.D.C. 2019) (citing *100Reporters LLC v. U.S. Dep't of Justice*, 248 F. Supp. 3d 115, 152 (D.D.C. 2017)); *see also Senate of P.R.*, 823 F.2d at 585 ("[T]o approve exemption of a document as predecisional, a court must be able 'to pinpoint an agency decision or policy to which the document contributed.'" (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1981))).

Plaintiff argues that the three pilot market assessments and related briefing documents discussed in the First IAD "are neither predecisional nor deliberative," Pl.'s Opp'n at 11; *see also* Pl.'s Reply at 8, and therefore contests VA's reliance on Exemption 5's deliberative process privilege to justify its withholding of 451 pages of these records, *see Vaughn* Index at 1–24, and

16

its redactions from twenty-two of the thirty-eight pages that were produced, *see Vaughn* Index at 1, 7, 11, 14, 18, 21. For the reasons explained below, the challenged withholdings and redactions involve predecisional and deliberative records and VA therefore properly asserted Exemption 5 to withhold or redact the information at issue.

### 2.   *Description of Information Withheld Pursuant to Exemption 5*

VA describes the seven disputed records as "three market assessment pilots," one of which "was broken into two documents, and three briefing documents," Swailes Decl. ¶ 13, totaling 489 pages, that "were created in part by [PWC] acting as an outside consultant on behalf of VA as deliverables to [the Pilot Study Contract]," in consultation with VHA employees, *id.* ¶ 15; *see also* Stuppy Decl. ¶ 7; *Vaughn* Index at 1, 4–5, 8, 11–12, 15, 18, 21. The three pilot studies underlying these documents were intended "to develop a uniform methodology to perform market assessments" in all ninety-six VISN markets and to "test[]" that methodology "in three diverse markets." Stuppy Decl. ¶ 6. For each study, the consultant, with input from agency employees, produced a pilot market assessment, *see Vaughn* Index at 7 (referring to Part 1 of the second pilot market assessment by Bates Nos. 68–127), 11 (referring to Part 2 of the second pilot market assessment by Bates Nos. 128–81), 14 (referring to the first pilot market assessment by Bates Nos. 182–328), 21 (referring to the third pilot market assessment by Bates Nos. 357–489), and a shorter briefing document, *see id.* at 1 (referring to the briefing document for the first pilot market assessment by Bates Nos. 1–42), 4 (referring to the briefing document for the second pilot market assessment by Bates Nos. 43–67), 17–18 (referring to the briefing document for the third pilot market assessment by Bates Nos. 329–56).

Upon issuance of the revised First IAD, VA released five pages that described "the eight-step methodology" used in the pilot studies "in full" as well as "additional pages that repeated methodology information" and "several pages that essentially had no substantive content," for a

total of thirty-eight pages.  Swailes Decl. ¶ 26; *see also* Stuppy Decl. ¶ 8 (outlining the draft methodology).  The agency redacted certain information, including the names of facilities and markets studied and content that would reveal the substance of the market assessments, from twenty-two of these thirty-eight pages.  *See Vaughn* Index at 1, 7, 11, 14, 18, 21.  The remaining 451 pages were withheld in full.  *See id.* at 1–24; *supra* Part I.C.

In asserting Exemption 5 to justify these withholdings, VA contends that the information withheld from all seven documents is "part of the foundation for VA to create its National Realignment Strategy."  Def.'s Mem. at 11; *see also Vaughn* Index at 2, 5, 9, 12, 16, 19, 22 (identifying "the national realignment strategy" as the overarching deliberative process to which the challenged records relate).  Each of the seven documents "contain[s] the objectives of the market assessment project, the developed methodology, the data utilized in testing the methodology in the selected markets, and the proposed recommendations resulting from the application of the methodology."  Swailes Decl. ¶ 17.  The withheld sections of the three pilot market assessments "contain[] the proposed recommendations and the rationale for suggesting those recommendations in testing the methodology in one of the pilot market assessments" carried out by PWC, *Vaughn* Index at 9; *see also id.* at 12, 16, 22–23, while the pages withheld from the three briefing documents are described as "a summary/briefing of the proposed recommendations" made in their respective pilot market assessment "and the rationale for suggesting those recommendations in testing the methodology in one of the pilot market assessments," *id.* at 2; *see also id.* at 6, 19.  The "[p]roposed recommendations" in each document "are based on an analysis of standard data considered by [PWC] in developing the test methodology for the 96 pilot market assessments."  *Id.* at 2–3; *see also id.* at 6, 9, 12–13, 16, 19, 23.

All seven records "were used to inform VA's needs in conducting . . . market studies" in each of the ninety-six VISN markets, Stuppy Decl. ¶ 10, which studies "are current and ongoing" and will identify "opportunities" for "capital investments, divestments, or shifts in services provided" to inform VA's National Realignment Strategy, *id.* ¶ 6.  Specifically, VA looked to the documents (1) "to evaluate the market assessment methodology and to determine which deliverables might be of interest to senior leaders," *id.*; (2) "to improve upon the methodology" used to carry out the pilot studies; (3) "to test [agency leaders'] appetite" for certain types of proposed reforms; and (4) to receive feedback on "pilot market assessments results for review by leadership" and "the content of the pilot market assessment reports, such as formatting and what information to include," *id.* ¶ 9.  VA further represents that the pilot market assessments "are not final as they pertain to" the three markets selected for study, because they represent an early step in the MAHSO project, which is "currently underway" and "is not considered complete until all 96 [market assessments] have been finished, as each market assessment builds/interacts with adjacent markets."  Swailes Decl. ¶ 19; *see also* Stuppy Decl. ¶ 10.  The agency avers that "the recommendations contained in the documents were not fully acted upon, finalized or operationalized."  Swailes Decl. ¶ 20; *see also* Stuppy Decl. ¶ 9 ("[T]he outcomes of the pilot studies—those identified . . . 'recommendations,' . . . were not intended to be acted upon, but were themselves part of the testing.").

### 3.    *The Withheld Documents Are Predecisional and Deliberative*

Based on the above description of the three pilot market assessments and three briefing documents, VA has shown that, while thirty-eight pages describing the draft methodology used in the studies were released, with some redactions, the deliberative process privilege properly applies to withhold the other 451 pages of these records.  The agency has adequately stated the deliberative processes involved (*i.e.,* VA's deliberations about how to conduct market

assessments in each of its ninety-six VISN markets and, in turn, how to develop its National Realignment Strategy); the role the withheld sections of the documents played (*i.e.,* evaluating the success and application of the draft methodology, considering how to present results of the market assessments to leadership, Congress, and the public, and identifying options for recommendations to be included in the National Realignment Strategy); and the nature of the decisionmaking authority of the author of the documents (*i.e.,* an outside consultant contracted to provide advice to the agency about how to carry out uniform market assessments).   The conclusions reached in the documents offer options for the presentation, development, and types of recommendations that the agency might choose to pursue in the course of the ninety-six VISN market assessments and the formation of the National Realignment Strategy.   PWC's suggestions on these topics remain under agency consideration.   Similarly, the assessment of and recommendations specific to the three pilot markets studied are not the agency's final evaluation of those markets.   VA's redactions from twenty-two of the thirty-eight released pages of the names of facilities and markets studied, and content revealing the substance of the pilot market assessments are likewise supported by these factors.

Plaintiff nonetheless challenges that the seven documents are neither predecisional nor deliberative in nature.   Each of these contentions is addressed in turn.

### (a)      Pilot Market Assessments and Briefing Documents Are Predecisional

Plaintiff first contends that "the pilot studies [and briefing documents] cannot be predecisional because they only reflect the consummation of the design of the uniform methodology" to be used by VA in completing assessments of all ninety-six VISN markets and therefore represent the agency's "final" view as to that methodology.   Pl.'s Opp'n at 9 (emphasis omitted); *see also* Pl.'s Reply at 3 ("The pilot studies only reflect finalization of the uniform

methodology used for the nationwide ninety-six market assessments.").  Thus, plaintiff proffers, VA's deliberations about the methodology at the center of the pilot market assessments have ended and "[a]ny supposed distinction between the pilot studies being 'complete' but not 'final' is mere sleight of hand."  Pl.'s Opp'n at 10.

At the outset, the agency's declarations, which state that "VHA uncovered ways to improve upon" the draft methodology used in the pilot market assessments, Stuppy Decl. ¶ 9, undermine plaintiff's view that the pilot studies represent VA's final methodology for conducting the market assessments.  *Cf. Goodrich Corp. v. EPA*, 593 F. Supp. 2d 184, 189 (D.D.C. 2009) (finding a draft groundwater flow model exempt because "evolving iterations of the Model's inputs and calibration . . . may not represent [the agency]'s ultimate opinions" related to the model (internal quotation marks omitted)).  More importantly, examination of the function of the pilot market assessments in the "administrative context" of the VA reform process outlined by the 2015 Act and the MISSION Act forecloses this argument.  *Sierra Club*, 141 S. Ct. at 786.

In support of its claim that the pilot market assessments and briefing documents are "final" and therefore not exempt, plaintiff argues that the documents are "entirely divorced from [VA]'s broader [and continuing] effort to design a national realignment strategy and criteria for future recommendations" pursuant to the 2015 Act and the MISSION Act, Pl.'s Opp'n at 9, pointing specifically to the MISSION Act's requirements that the AIR Commission and the President give final approval to VA's recommendations for realignment before they are implemented, *see id.* at 9–10; Pl.'s Reply at 2–3; *supra* Part I.A.  Plaintiff correctly notes that the MISSION Act requires the AIR Commission to approve VA's recommendations, *see* MISSION Act § 203(c), and confers final decisionmaking authority with respect to VA reform on the

President, *see id.* §§ 203(d), 204(a).  Before that final decisionmaking authority comes into play, however, VA must carry out market assessments of each VISN, *see id.* § 203(b)(3), and publish in the Federal Register and submit to Congress the criteria to be used by the agency in developing the recommendations that will comprise its National Realignment Strategy, *see id.* § 203(a)(1), (3); and the Secretary of VA must transmit to Congress and the AIR Commission a report on the agency's findings and recommendations for realignment within each VISN for approval first by the AIR Commission and then by the President, *see id.* §§ 203(b)(1), (3).  The Secretary's recommendations must substantially conform to the published final criteria, *see id.* § 203(c), and account for certain factors enumerated in the MISSION Act, *see id.* § 203(b)(2), but the agency is otherwise free to decide which criteria and recommendations to submit, as plaintiff concedes, *see* Pl.'s Reply at 3.

Thus, as the agency rightly notes, VA retains "ultimate responsibility for developing the criteria to be used in modernization and realignment efforts" and exercises "control over the process leading to [its] recommendations" until those final criteria and recommendations are published in the Federal Register or submitted to Congress and the AIR Commission, as the MISSION Act requires.  Def.'s Reply at 3; *see also* MISSION Act § 203(a), (b).  The deadlines for VA to do so have not yet passed.  *See supra* Part I.A.  Until they do, VA has substantial discretion to determine which inputs are relevant to its decisionmaking process and, crucially, to change those inputs and its resulting views on the National Realignment Strategy.  The criteria, report, and recommendations actually submitted to Congress will carry legal consequences, as they will cabin VA's discretion at the later stages in the formation of the National Realignment Strategy and trigger a statutory process for review, revision, and finalization of a plan for reform

of VA's health services by other actors, *see* MISSION Act §§ 203, 204, but VA's preliminary efforts to create those deliverables do not.

The place of the pilot market assessments and briefing documents within this larger statutory process for development of the National Realignment Strategy makes clear that they are not final, as *Sierra Club* understands that term. *See Sierra Club*, 141 S. Ct. at 786. As a first step in the statutory process for VA reform set forth in the 2015 Act and the MISSION Act, VA determined that the MAHSO analysis was key to complying with its obligations under those laws and informing its choice of recommendations for each VISN. To carry out that analysis, it entered into the Pilot Study Contract with PWC to develop a methodology for its ninety-six VISN market assessments. The deliverables created pursuant to that Contract, the contested records here, represent an early effort by VA to design the MAHSO analysis. They may themselves be "complete," insofar as VA has no immediate plans to revise them further, but they represent just one of many steps that VA must take before the MAHSO analysis, and in turn, the National Realignment Strategy, are "final." At any point during this process that precedes the submission of the agency's findings and recommendations, so long as it remains faithful to the final criteria that will be published in the Federal Register by May 31, 2021 and to the MISSION Act's guidelines for the market assessments, VA is free to change its approach to the assessments without any consultation or review with outside actors. Even if plaintiff is correct, in practical terms, in contending that "[t]he pilot studies only reflect finalization of the uniform methodology used for the nationwide ninety-six market assessments," Pl.'s Reply at 3, the use (or abandonment) of this methodology by the agency has no legal consequences that support a finding of finality. *See Sierra Club*, 141 S. Ct. at 787 (emphasizing "the legal, not practical, consequences that flow from an agency's action" in assessing finality).

Relatedly, the continuing "possibility of changes" to both the methodology and the specific assessments and recommendations as to each of the three pilot markets set forth in the pilot market assessments counsels against concluding that these documents are final.  *Id.*; *see also Am. Soc'y for Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*, 19 Civ. 3112 (NRB), 2021 WL 1163627, at *12 (S.D.N.Y. Mar. 25, 2021) (finding exempt under *Sierra Club* information that "would reveal the Agencies' interim thoughts on courses of action that are contingent and subject to change").  Until its final report to Congress is submitted, VA could abandon the pilot market assessments altogether, modify the methodology set forth therein, or determine that it does not wish to pursue the types of recommendations included in the seven deliverables, and the agency in fact states that the methodology has been and may continue to be revised.  Stuppy Decl. ¶ 9; *see also* Def.'s Mem. at 12 ("[T]he pilot market assessments are a part of VA's ongoing deliberative process to develop a final market assessment methodology[.]" (emphasis omitted)).  Moreover, VA explicitly declares that the pilot market assessments "are not final as they pertain to" the evaluation of or recommendations concerning the three pilot markets because "each market assessment builds/interacts with adjacent markets" and therefore will evolve over the course of the MAHSO project.  Swailes Decl. ¶ 19 ("[T]he geographic areas covered in the pilot market assessments are being re-done in the larger 96-market assessment project."); *see also id.* ¶ 20; Stuppy Decl. ¶¶ 9–10.  In the face of these clear disclaimers of finality, the record does not support a conclusion that VA "treats" the pilot market assessments and briefing documents "as its final view" on either the methodology for the market assessments as a whole or the assessment of the three pilot markets in particular.  *Sierra Club*, 141 S. Ct. at 786.

Recycling arguments already addressed, plaintiff attempts to distinguish *Sierra Club* on the grounds that the pilot market assessments "'reflect the consummation of the design of the uniform methodology,'" Pl.'s Reply at 6 (quoting Pl.'s Opp'n at 9), in contrast to the draft biological opinions at issue in *Sierra Club*, which were "more like 'drafts of draft[s]' as the defendant agencies never held them out to be 'final' and considered them 'subject to change,'" *id.* at 5 (quoting *Sierra Club*, 141 S. Ct. at 788). Plaintiff accurately recites the teaching of *Sierra Club*, but misapplies it to these records. As explained above, like the draft biological opinions disputed in that case, the pilot market assessments and briefing documents are regarded by VA as subject to revision as to both the methodology they propose and their specific findings about the three pilot markets. Further, VA has not held these documents out as final in any way. It notes in its *Vaughn* Index that each document is "labeled as a draft," *Vaughn* Index at 2, 5, 9, 12, 16, 19, 22; *see Sierra Club*, 141 S. Ct. at 788 ("[A] draft document will typically be predecisional because . . . calling something a draft communicates that it is not yet final[.]"), and describes in its declarations the role of the documents as a first step in its larger MAHSO project, which will culminate with the presentation of findings and recommendations to Congress and the AIR Commission, *see* Stuppy Decl. ¶¶ 6–10; Swailes Decl. ¶¶ 19–20.

Plaintiff next cautions that finding these records to be predecisional "because what matters is the 'VA's final decision' in the realignment process . . . is a serious misreading of *Sierra Club*" and "would require treating *everything* even remotely related to VA reform efforts as privileged." Pl.'s Reply at 5.[5] The *Sierra Club* Court rejected a similar argument posited by

---

[5]      Plaintiff argues that "[t]he agency's behavior in the instant proceeding . . . shows that this cannot be the right result," pointing to VA's "second and third productions" of responsive records, "totaling nearly 1,500 pages." Pl.'s Reply at 5 (citing Pl.'s SMF ¶¶ 15–16). Closer scrutiny of the record discredits this claim. Although VA identified nearly 1,500 pages of responsive records in its second and third IADs, *see* Swailes Decl. ¶ 25; Pl.'s SMF ¶¶ 15–16; Def.'s Resp. SMF ¶¶ 15–16, the agency appears to have withheld a substantial portion of these documents pursuant to Exemptions 5 and 6. For example, VA's August 2020 IAD identified 676 pages of responsive records and five responsive Excel sheets, Swailes Decl. ¶ 25; Pl.'s SMF ¶ 15; Def.'s Resp. SMF ¶ 15, but the parties

the plaintiff in that case, that allowing agencies to withhold documents based on the theoretical possibility of changes to them, regardless of the practical consequences, "would permit [an agency] to stamp every document 'draft,' thereby protecting even final agency decisions and creating 'secret [agency] law.'"  141 S. Ct. at 788 (second alteration in original) (quoting *Sears*, 421 U.S. at 153).  The Court regarded this threat as minimal because "determining whether an agency's position is final . . . is a functional rather than formal inquiry," noting that "[i]f the evidence establishes that an agency has hidden a functionally final decision in draft form, the deliberative process privilege will not apply," but the defendant agency had not "engage[d] in such a charade."  *Id*.  Nor has VA.  To the contrary, the record shows that VA continues to refine its methodology as the nationwide market assessments progress and will revisit its evaluation of the pilot markets as more information emerges.

Nor does the common-sense conclusion that these seven documents are not final in either function or form indicate, as plaintiff suggests, *see* Pl.'s Reply at 5, that all records related to the National Realignment Strategy are necessarily exempt from disclosure.  Each withheld document that relates to the National Realignment Strategy must be assessed in the "administrative context" that produced it and in light of its function within the agency's decisionmaking process. *Sierra Club*, 141 S. Ct. at 786.  As applied here, those factors indicate that the pilot market assessment and briefing documents are not final, but that determination does not foreclose a future finding that records related to another, distinct component of the National Realignment Strategy, for example, VA's development of the criteria to be published in the Federal Register, must be disclosed.

---

represented to the Court that this IAD "withh[eld] 672 pages of responsive records and 5 Excel sheets in full under FOIA Exemption 5 and the deliberative process privilege, as well as FOIA Exemption 6," while "[f]our pages were released in part," Sept. 4 JSR at 1.

Plaintiff next challenges VA's claim that the seven documents are predecisional with respect to "each of the markets that were the subject of the three pilot market assessments." Def.'s Reply at 5; *see* Pl.'s Opp'n at 10–11; Pl.'s Reply 6–7.  As support, plaintiff argues that, because "[t]he agency never intended to treat the pilot studies . . . as the basis for final criteria and recommendations for the national realignment strategy," but rather "undertook the pilot studies to develop a uniform methodology," the status of the pilot market assessments' findings as to the test markets is irrelevant.  Pl.'s Reply at 7 (internal quotation marks omitted); *see also* Pl.'s Opp'n at 10–11 (characterizing the pilot market assessments as "final work product, delivered to [VA] by its contractor, which concern the methodology adopted for the nation-wide market assessment process" (emphasis omitted)).

Even taking plaintiff's narrow view of the role played by the pilot market assessments, application of the draft methodology to the pilot markets was central to "allow[ing] [the agency] to fully understand if the methodology was appropriate for use in a standardized manner," Stuppy Decl. ¶ 9, and these components of the reports are therefore predecisional to the final methodology.  Moreover, VA's declarations make clear that the agency used the pilot market assessments for purposes beyond development of the methodology, for example, to consider which types of recommendations and reforms the agency might be interested in pursuing and how to present its findings and recommendations in its eventual reports to Congress and the AIR Commission.  *See* Stuppy Decl. ¶¶ 9–10.  These actual uses of the records by the agency, not VA's purported intentions in undertaking the pilot market assessments, are the relevant considerations for Exemption 5 purposes.  *See, e.g.*, *Sierra Club*, 141 S. Ct. at 788 (looking to documents' "function[]" within an agency's decisionmaking process); *Ctr. for Biological Diversity*, 279 F. Supp. 3d at 147 (emphasizing "the role played by the documents at issue in the

course of [the deliberative process to which they relate]" in determining whether Exemption 5 was properly asserted (internal quotation marks omitted)).  The findings and recommendations made as to the pilot markets inform VA's deliberations about its approach to the MAHSO project and to identifying opportunities for improvement it wishes to explore further.  That the market-specific results in these seven records were not meant to act as VA's final assessment of those markets has no impact on their continuing role in the deliberative process.

Further, VA's representation that "the geographic areas covered in the pilot market assessments are being re-done in the larger 96-market assessment project," Swailes Decl. ¶ 19, contrary to plaintiff's characterization, in fact supports the conclusion that the pilot market assessments and briefing documents are predecisional as to the pilot markets.  Regardless of whether VA intended for the pilot studies to produce final evaluations of the subject markets or not, the pilot studies reflect a preliminary effort to assess the conditions of those markets, identify problems, and propose solutions.  VA is in the process of reassessing those very conclusions in the same markets.  The pilot market assessments' market-specific content, then, is plainly predecisional.  *See, e.g.*, *Judicial Watch, Inc.*, 847 F.3d at 739; *Pavement Coatings Tech. Council v. U.S. Geological Surv.*, 436 F. Supp. 3d 115, 127 (D.D.C. 2019) (finding documents that "reflect[ed]" agency employees' "thoughts regarding draft documents and preliminary analyses of scientific studies and results" predecisional); *Sack v. CIA*, 49 F. Supp. 3d 15, 22–23 (D.D.C. 2014) (deeming predecisional withheld documents that "discuss[ed] progress or actions taken on recommendations" given to an agency by an expert panel because the documents "were part of the Agency's ongoing process of evaluating recommendations made . . . and assessing programmatic changes" (internal quotation marks omitted)).[6]

---

[6]     Plaintiff's efforts to distinguish *Stalcup v. CIA*, 768 F.3d 65 (1st Cir. 2014), a case cited by VA for the proposition that "[a] decision cannot be considered final if it is subject to change," Def.'s Reply at 5, are without

In short, the pilot market assessments and briefing documents about three test markets represent a methodology for conducting uniform, nationwide market assessments, which methodology is subject to change and indeed, has already been revised, and the assessments themselves are currently in the process of being reexamined. The assessments will inform VA's determination of how to approach the ninety-six VISN market assessments, the types of recommendations to pursue, and how to present that information to agency leadership, Congress, and the public. They have no operative legal effect, their actual use by VA in the course of carrying out the MAHSO analysis notwithstanding. All of these factors show that the seven contested records are predecisional.

### (b)   Pilot Market Assessments and Briefing Documents Are Deliberative

Plaintiff next asserts that the seven documents "cannot be 'deliberative' because they do not 'make recommendations or express opinion on legal or policy matters'" and "do not reflect the 'give-and-take of the consultative process.'" Pl.'s Opp'n at 11 (first quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975); then quoting *Coastal States*, 617 F.2d at 867). In plaintiff's view, "the pilot studies, and related briefing documents, do not reflect 'internal deliberations on the advisability of any particular course of action,' such as finalizing realignment criteria or other recommendations for public comment and congressional or presidential consideration." *Id.* (quoting *Pub. Citizen, Inc.*, 598 F.3d at 875); *see also* Pl.'s Reply

---

merit. The First Circuit in *Stalcup* found supplemental reports prepared by the CIA in response to "new data" on a particular issue previously studied to be predecisional because, in preparing the supplements, the agency "undertook to determine whether its prior assessment was accurate or whether it needed to change its position." *Stalcup*, 768 F.3d at 71–72. Unlike the requester in *Stalcup*, plaintiff seeks the original assessment of the pilot markets, not the revised assessments that are currently in progress. Thus, plaintiff's claim that VA's "reassessment of the three geographic markets chosen for the pilot studies is decidedly *not* an attempt to supplement or modify the outcomes of those assessments," Pl.'s Reply at 7, is inapposite. Moreover, the court's decision relied not, as plaintiff contends, on the agency's "attempt to supplement or modify" its earlier report, *id.*, but instead on the fact that the later documents were "prepared for the specific purpose of aiding the agency in its [forthcoming] determination," 768 F.3d at 72 (internal quotation marks and citation omitted). In other words, even though the supplements revisited an earlier draft report, none of the drafts reflected the agency's final decision on the issue discussed. The same is true of the pilot market assessments' explication of conditions in the test markets and market-specific recommendations.

at 8 (challenging VA's claim that the pilot studies are "inextricably intertwined with the draft

market assessments currently underway" (quoting Def.'s Reply at 6–7)).[7]

      This argument construes the scope of the deliberative materials encompassed by

Exemption 5 too narrowly.  The D.C. Circuit has long held that Exemption 5 "covers

recommendations, draft documents, proposals, suggestions, and other subjective documents

which reflect the personal opinions of the writer rather than the policy of the agency," *Coastal*

*States*, 617 F.2d at 866; *see also Pub. Citizen, Inc.*, 598 F.3d at 875, and that the universe of

covered agency decisions extends "not only to official agency policies but also to agency

decisions more generally," *Pavement Coatings Tech. Council*, 436 F. Supp. 3d at 127 (citing

*Reliant Energy Power Generation, Inc. v. FERC*, 520 F. Supp. 2d 194, 205 (D.D.C. 2007)).

Here, the pilot market assessments and briefing documents relate to VA's choice of methodology

to carry out the market assessments, the types of improvement opportunities to pursue, and how

to present its findings to the AIR Commission, Congress, and the public.  Decisions of this ilk

---

[7]     In making this argument, plaintiff points to two alleged inconsistencies in VA's declarations, *see* Pl.'s Opp'n at 9–10, 10 n.5; Pl.'s Reply at 4, 8, 8 n.1, both of which are answered by examining the cherry-picked statements in context.  Plaintiff first asserts that the declarations' claim that "[t]he purpose of the pilot market assessments . . . was solely to test and refine the market assessment methodology for performing comprehensive market assessments," Stuppy Decl. ¶ 7 (emphasis omitted); *see also id.* ¶ 6, stands in tension with VA's assertion that the pilot studies are part of the deliberative processes underlying the National Realignment Strategy, *see, e.g.*, *Vaughn* Index at 2.  These statements, read in the context in which they appear, of describing the Pilot Study Contract, the focuses of its evaluations, and the steps taken to carry out the pilot studies, *see* Stuppy Decl. ¶¶ 6–7, indicate only that the pilot market assessments were designed to develop a process for performing the market assessments nationwide and reporting their outcomes rather than to generate substantive evaluations of the markets studied.  They do not imply, as plaintiff suggests, that VA's use of the deliverables would be rigidly confined to consideration of the methodology in a vacuum.  The declarations' characterization of the pilot market assessments as informing the process by which VA would undertake the balance of the MAHSO analysis is fully consistent with the agency's representation that these records contribute to the National Realignment Strategy.

     Plaintiff next contends that VA's claim that "[t]he information used and analyzed in conducting the pilot assessment is/will be used in the larger 96-market assessment project and is inextricably intertwined with the ongoing market assessments," Swailes Decl. ¶ 18, contradicts what plaintiff portrays, without quoting the challenged portion of the cited declaration, as "testimony, which indicates the *only* aspect of the pilot studies imported into the subsequent nation-wide assessments is the uniform 'methodology,'" Pl.'s Opp'n at 10 n.5 (citing Stuppy Decl. ¶¶ 6–7); *see also* Pl.'s Reply at 8 n.1.  Even taking plaintiff's description of this testimony as true, no contradiction exists.  Common sense dictates that, if VA has elected to use a subsequent version of the methodology tested in the pilot market assessments to conduct its final market assessments, including of the three test markets, the same data and factual information will be relevant to those studies.  This reality is not inconsistent with VA's representation that the analysis and conclusions drawn from those sources in the pilot market assessments will not be carried over into its final studies because it is in the process of reevaluating those elements.

are regularly held to fall within the scope of Exemption 5 even though they may not be "final" or "official" decisions of policy or law.[8]  Plaintiff's contention that the pilot market assessments and briefing documents must have "some broader function and significance . . . in the overall scheme of agency decisionmaking," Pl.'s Reply at 8, is thus mistaken.  VA has shown that it continues to build on the methodology proposed in these records as it completes the MAHSO analysis, and that these records inform its "refine[ment]" of not only the methodology, but also the types of substantive recommendations that may be made in relation to each VISN and the information that may be included in its market assessment reports.  Stuppy Decl. ¶ 9; *see also supra* Part III.A.2, 3.a.  The deliberative process privilege requires nothing more.

In sum, the pilot market assessments and briefing documents are both predecisional and deliberative, and VA properly invoked Exemption 5's deliberative process privilege to justify its withholding of information from these records.

## B.    Foreseeable Harm

Plaintiff next contends that VA has "fail[ed] to satisfy the . . . foreseeable harm standard," Pl.'s Opp'n at 21, under the FOIA Improvement Act of 2016 because the agency has not "offer[ed] factual support for the supposed harms" it claims would result from disclosure, *id.* at 19 (emphasis omitted), or "specifically tie[d] the expected harms to the records at issue . . . in a reasonable manner," *id.* at 21; *see also* Pl.'s Reply at 13–15.  The FOIA Improvement Act provides that "[a]n agency shall withhold information . . . only if the agency reasonably foresees that disclosure would harm an interest protected by" one of the nine FOIA exemptions.  5 U.S.C.

---

[8]       *See, e.g.*, *Ecological Rights Found.*, 2021 WL 535725, at *15 ("[A]n agency's consideration of what information to present to external parties and how to present it is a [protected agency] decision in itself[.]"); *Husch Blackwell LLP v. EPA*, 442 F. Supp. 3d 114, 122–23 (D.D.C. 2020) (holding "materials preparing officials for congressional testimony and draft responses to Congress" exempt from disclosure under the deliberative process privilege (internal quotation marks omitted)); *Urban Air Initiative, Inc. v. EPA*, 271 F. Supp. 3d 241, 261 (D.D.C. 2017) (finding that agency decisions about a study preliminary to creation of "an updated emissions model" were "exactly the type of agency judgments that the deliberative process privilege protects").

§ 552(a)(8)(A).  This provision requires agencies withholding information under an exemption to show not only that a withheld record "falls within a FOIA exemption," but also "that the agency 'reasonably foresees that disclosure would harm an interest protected by [the] exemption.'" *Machado Amadis*, 971 F.3d at 370 (alteration in original) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)).

An agency successfully makes this second, "heightened" showing, *Judicial Watch, Inc. v. U.S. Dep't of Com.*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019), by "'identify[ing] specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials' and 'connect[ing] the harms in [a] meaningful way to the information withheld,'" *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106 (third alteration in original) (quoting *Judicial Watch, Inc. v. U.S. Dep't of Justice* ("*Judicial Watch II*"), Civ. A. No. 17-0832 (CKK), 2019 WL 4644029, at *5 (D.D.C. Sept. 24, 2019)); *see also* H.R. Rep. No. 114-391, at 9 (2016) ("An inquiry into whether an agency has reasonably foreseen a specific, identifiable harm that would be caused by a disclosure would require the ability to articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld.").  Agencies therefore "must provide more than 'nearly identical boilerplate statements' and 'generic and nebulous articulations of harm.'" *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106 (quoting *Judicial Watch II*, 2019 WL 4644029, at *4–5).

"[T]he agency's burden to demonstrate that harm would result from disclosure may shift depending on the nature of the interests protected by the specific exemption with respect to which a claim of foreseeable harm is made." *Ecological Rights Found.*, 2021 WL 535725, at *32 (citing *Rosenberg v. Dep't of Def.*, 442 F. Supp. 3d 240, 259 (D.D.C. 2020); S. Rep. No. 114-4, at 8 (2015)).  To demonstrate foreseeable harm with respect to exemptions under the

deliberative process privilege, "[t]he agency 'cannot simply rely on generalized assertions that disclosure could chill deliberations,'" but instead "must 'provide context or insight into the specific decision-making processes or deliberations at issue, and how they in particular would be harmed by disclosure.'"  *Id.* (first quoting *Machado Amadis*, 971 F.3d at 371; and then quoting *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 107).  Contrary to plaintiff's characterization, however, this requirement for an agency to describe assertions of foreseeable harm with specificity and to contextualize the harms anticipated does not require an agency to "offer factual support for the supposed harms," Pl.'s Opp'n at 19 (emphasis omitted); *see also* Pl.'s Reply at 14, as the D.C. Circuit's recent decision in *Machado Amadis v. U.S. Department of State*, 971 F.3d 364 (D.C. Cir. 2020), clearly illustrates.

The D.C. Circuit in *Machado Amadis* considered the adequacy of an agency's foreseeable harm showing under the deliberative process privilege.  The agency in that case produced, in response to the plaintiff's FOIA request, a series of "Blitz Forms," documents used to adjudicate FOIA appeals, with redactions under the deliberative process privilege.  971 F.3d at 369–71.  In support of the redactions, the agency's affidavit stated that the withheld materials revealed "line attorneys' evaluations, recommendations, discussions, and analysis which are prepared for senior-level review and decisionmaking," *id*. at 370 (internal quotation marks omitted), and asserted that disclosure of this information "would discourage line attorneys from candidly discussing their ideas, strategies, and recommendations, thus impairing the forthright internal discussions necessary for efficient and proper adjudication of administrative appeals," *id.* at 371 (alteration and internal quotation marks omitted).  The D.C. Circuit deemed this showing of foreseeable harm sufficient, without any further factual proffer by the agency, because the agency "specifically focused on the information at issue" and properly "concluded that

disclosure of that information would chill future internal discussions." *Id.* (internal quotation marks omitted); *see also Ecological Rights Found.*, 2021 WL 535725, at \*32.

VA's *Vaughn* Index and declarations in this case make a similarly adequate showing.  As in *Machado Amadis*, VA identifies the contents of the documents with sufficient particularity. *See Vaughn* Index at 1–24.  The agency affirmatively concludes, with respect to each of the seven challenged records, that disclosure would harm an interest protected by the privilege. *See Sierra Club*, 141 S. Ct. at 785; *Machado Amadis v. Dep't of Justice*, 388 F. Supp. 3d 1, 18–19 (D.D.C. 2019) (summarizing the relevant interests of the privilege); *supra* Part III.A.1.  VA first states that disclosure of the withheld information "would chill future agency deliberations, causing harm to the agency's ability to obtain a comprehensive and thoughtful analysis that considers all aspects of the issues affected." *Vaughn* Index at 3; *see also id.* at 6, 9, 13, 16, 19– 20, 23; Swailes Decl. ¶ 21.  It further submits that "[r]eleasing data" used in the pilot market assessments "without knowledge of how that data is being used or linked to VA recommendations would undermine the project as the data may be misleading or misinterpreted, causing individuals to draw conclusions about VA action that may not be accurate," while releasing "recommendations in the pilot studies that ultimately may not be made or proposed" in the National Realignment Strategy would generate confusion about VA's plans for the continued provision of veteran health care in certain markets. *Vaughn* Index at 3; *see also id.* at 6, 10, 13, 16–17, 20, 23.  In the agency's view, the resulting speculation by the public "could further affect VA's ability to negotiate for private care" by exposing vulnerabilities in VA's existing services and could "create concern among patients, employees, and the community generally" with respect to the implications of the non-binding, predecisional recommendations made in the pilot market assessments. *Vaughn* Index at 3–4; *see also id.* at 7, 10, 13–14, 17, 20, 23–24; Stuppy

Decl. ¶¶ 13–16; Swailes Decl. ¶ 21.  Finally, VA contends that "the moment a pilot assessment is released, interested parties may interpret the pilots and try to influence the working recommendations or opportunities (positively or negatively) identified in the pilot market assessment or the currently underway market assessments.  Shifting the focus to individual interests would undermine the goal of the ongoing assessments, *i.e.*, the creation of high performing networks that provide high-quality, readily accessible care for Veterans."  Stuppy Decl. ¶ 12; *see also* Swailes Decl. ¶ 21.  These predicted results of disclosure are "exactly what the privilege seeks to prevent."  *Machado Amadis*, 971 F.3d at 371; *see also Ecological Rights Found.*, 2021 WL 535725, at *32.[9]

Like the declarations found sufficient in *Machado Amadis*, VA also links these specified harms to "specific information contained in the material withheld."  *Judicial Watch II*, 2019 WL 4644029, at *4 (internal quotation marks and citation omitted).  For each of the seven documents, VA explains that disclosure "would chill future agency deliberations" by impeding "the agency's ability to obtain [from staff or external consultants] a comprehensive and thoughtful analysis that considers all aspects of the issues affected" and causing VA staff engaged in the ongoing market assessments "to be subjected to pressure" from external stakeholders "as they evaluate the data and make recommendations," to the detriment of the agency's efforts to act objectively.  Swailes Decl. ¶ 21; *see also Vaughn* Index at 3–4, 6–7, 9–10, 13–14, 16–17, 20, 23.  VA further indicates that release could lead external stakeholders to

---

[9]     Plaintiff contends that VA's assertion of public confusion or concern as a potential harm of disclosure carries no weight because the MISSION Act "opened the realignment process to public participation."  Pl.'s Reply at 14; *see also* Pl.'s Opp'n at 20.  While the MISSION Act subjects VA's submission of criteria and recommendations to scrutiny by the public, the AIR Commission, Congress, and eventually the President, this feedback from external stakeholders begins only after VA finalizes its criteria and recommendations internally.  *See supra* Part I.A.  Disclosure of VA's intra-agency deliberations preceding its final determination of the criteria and recommendations that will be submitted for public scrutiny thus continues to pose risks associated with public confusion or misinterpretation, the MISSION Act's provision for public participation in the formation of the National Realignment Strategy notwithstanding.

"draw erroneous conclusions" about VA's plans for reform in one of the test markets or on a national scale, as compared to the recommendations VA eventually includes in its National Realignment Strategy.  Swailes Decl. ¶ 21; *see also* Stuppy Decl. ¶¶ 15–16; *Vaughn* Index at 3, 6, 9, 13, 16, 20, 23–24.  This explanation "specifically connects disclosure of [the records] to a tangible chilling effect," here among VA staff involved in the agency's ongoing market assessments, and a concrete risk of generating public confusion.  *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 487 F. Supp. 3d 38, 47 (D.D.C. 2020) (finding a similar level of detail sufficient in light of *Machado Amadis*); *see also Ecological Rights Found.*, 2021 WL 535725, at *33 (same).  The standard of *Machado Amadis* requires nothing more.

## C.    Segregability

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt" from disclosure.  5 U.S.C. § 552(b).  Producing segregable information is essential for agencies' FOIA compliance, and "district courts cannot approve withholding exempt documents 'without making an express finding on segregability.'"  *Machado Amadis*, 971 F.3d at 371 (quoting *Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007)); *see also Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) ("[B]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." (internal quotation marks and citation omitted)); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) (same).

In evaluating segregability, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material."  *Sussman*, 494 F.3d at 1117.  Even under that presumption, "the agency must provide a 'detailed justification' for [the exempt material's] non-segregability," but need not "provide so much detail that the exempt material

would be effectively disclosed." *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data Ctr., Inc. v. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977)).  Affidavits attesting to the agency's "line-by-line review of each document withheld in full" and the agency's determination "that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions," in conjunction with a *Vaughn* index describing the withheld record, suffice.  *Id.* (internal quotation marks omitted); *see also Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination").[10]

To this end, VA has averred that, upon revision of the First IAD, it "re-reviewed the four hundred and eighty-nine pages" of the seven challenged records and "released the five pages containing the [pilot market assessment] methodology in full" as well as "additional pages that repeated methodology information" and "several pages that essentially had no substantive content and release of which would not harm the agency," with redactions to twenty-two of these pages.  Swailes Decl. ¶ 26; *see Vaughn* Index at 1–24.  As to the pages withheld in full, the agency represents that, when issuing the First IAD, it "determin[ed] the content" of the pages, "including factual information," and "determined that [it] was unable to reasonably segregate any non-exempt material as the remaining portion would have minimal or no informative or substantive content, so as to render the document essentially meaningless."  Swailes Decl. ¶ 23.

---

[10]      The FOIA Improvement Act of 2016 added another provision concerning segregability: An agency shall "(I) consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible; and (II) take reasonable steps necessary to segregate and release nonexempt information."  5 U.S.C. § 552(a)(8)(A)(ii).  The D.C. Circuit has interpreted subsection (b) of FOIA to be satisfied by affidavits attesting to the agency's "line-by-line review of each document withheld in full" and the agency's determination "that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions."  *Johnson*, 310 F.3d at 776 (internal quotation marks omitted).  The FOIA Improvement Act's new provision on segregability "appears to require no more than that."  *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 115.

It states, for each of the contested documents, that any potentially non-exempt factual

information and data is "inextricably intertwined" with privileged information, "as it contributes

to the rationale for making the proposed recommendations and methodology used in the pilots,"

*Vaughn* Index at 4; *see also id.* at 6, 9, 13, 16, 19, 23, and that "[t]he information used and

analyzed in conducting the pilot assessments is/will be used in the larger 96-market assessment

project" and thus "is inextricably intertwined with the ongoing market assessments," Swailes

Decl. ¶ 18; *see also Vaughn* Index at 2, 5, 8, 12, 15, 18, 22.  VA's declarations and *Vaughn*

Index are therefore sufficient to establish non-segregability of the disputed exempt records.

Plaintiff raises three challenges to this conclusion.  First, plaintiff disputes VA's claim

that factual information within the documents is exempt, contending that VA has failed to

"explain in detail why factual and deliberative material are inextricably intertwined."  Pl.'s Reply

at 15 (internal quotation marks omitted); *see also* Pl.'s Opp'n at 22.  "[W]ell-established law in

this Circuit [provides] that the deliberative process privilege operates to shield from disclosure

agency decision-making reflecting the collection, culling and assessment of factual information

or . . . data."  *Ctr. for Biological Diversity v. EPA*, 369 F. Supp. 3d 1, 20 (D.D.C. 2019)

(collecting cases); *see also Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504,

513 (D.C. Cir. 2011) (holding exempt factual information "culled . . . from the much larger

universe of facts" available because this "reflect[ed] an exercise of judgment as to what issues

are most relevant to the pre-decisional findings and recommendations" (internal quotation marks

omitted)); *Pavement Coatings Tech. Council*, 436 F. Supp. 3d at 129 (similar); *Goodrich Corp.*,

593 F. Supp. 2d at 189 ("[E]ven if the data plugged into the model is itself purely factual, the

selection and calibration of data is part of the deliberative process to which Exemption 5

applies[.]"); *Reliant Energy Power Generation, Inc.*, 520 F. Supp. 2d at 205–06 (finding

"spreadsheets and tables that analyze raw data" exempt from disclosure (alteration and internal

quotation marks omitted)).  The data and facts chosen by VA, or its consultant, to test the pilot

market assessment methodology are therefore properly withheld under Exemption 5 independent

of their relationship to the remainder of the seven documents.  Moreover, courts in this Circuit

routinely find "inextricably intertwined" language of a similar specificity to that proffered by VA

to be sufficient for segregability purposes.  *See, e.g.*, *Elec. Frontier Found. v. Dep't of Justice*,

739 F.3d 1, 12–13 (D.C. Cir. 2014); *Ecological Rights Found.*, 2021 WL 535725, at \*34 (relying

on similar "inextricably intertwined" language in agency's declarations); *Ctr. for Biological

Diversity*, 369 F. Supp. 3d at 26 (same).

Second, plaintiff contends that VA's revision of the First IAD demonstrates that the

agency "has already once overredacted records and thus failed to conduct the necessary line-by-

line review for non-exempt material."  Pl.'s Opp'n at 22–23; *see also* Pl.'s Reply at 16.  An

agency's revision of its previous segregability determination does not, as plaintiff suggests, raise

an inference that the agency has failed to comply with its obligation to release all reasonably

segregable, non-exempt information.  To the contrary, supplemental releases of information

"evidence[] a good-faith effort on the [agency's] part to segregate nonexempt information where

possible."  *Schoenman v. FBI*, 575 F. Supp. 2d 136, 161 (D.D.C. 2008); *see also Ecological

Rights Found.*, 2021 WL 535725, at \*34 (finding the agency's representation that it "provided

supplemental releases of information where possible" to support the conclusion that it had

released all reasonably segregable information (internal quotation marks omitted)).  Nor does

VA's revisiting of its earlier determination rebut the presumption that the agency has fulfilled its

segregability obligations.  *See Sussman*, 494 F.3d at 1117.

Finally, plaintiff asserts that VA "is mistaken that it need not disclose segregable material that it finds 'meaningless' or of 'minimal or no informative or substantive content.'"  Pl.'s Opp'n at 23 (quoting Swailes Decl. ¶ 23); *see also* Pl.'s Reply at 16–17.  As plaintiff accurately recites, however, an agency need not release otherwise-segregable information "if it can demonstrate that disclosure of the non-exempt portion of the document would result in the release of 'only incomplete, fragmented, unintelligible sentences composed of isolated meaningless words.'" *Cause of Action Inst. v. U.S. Dep't of Com.*, Civ. A. No. 1:19-cv-778 (CJN), 2021 WL 148386, at *11 (D.D.C. Jan. 14, 2021) (quoting *Brown v. Dep't of Justice*, 734 F. Supp. 2d 99, 111 (D.D.C. 2010)).  Plaintiff misinterprets both the burden placed on an agency by this standard and the import of VA's assertion that the non-exempt, segregable portions of the seven contested records, if released independent of the exempt material, would be "essentially meaningless." Swailes Decl. ¶ 23.  To carry its initial burden to demonstrate that it has complied with its segregability obligations, "the agency need only show with 'reasonable specificity' that the information withheld cannot be further segregated," triggering the presumption that it has complied with its segregability obligations.  *Cause of Action Inst.*, 2021 WL 148386, at *11 (quoting *Armstrong v. Exec. Off. of President*, 97 F.3d 575, 580 (D.C. Cir. 1996)).  As explained above, VA has met this requirement.  The agency's statement that any disclosure of non-exempt, segregable information would result in release only of an "essentially meaningless" document with "minimal or no informative or substantive content," Swailes Decl. ¶ 23, suffices to show that the withheld information could not be further segregated, *see Cause of Action Inst.*, 2021 WL 148386, at *11 (finding an agency's declaration that release of non-exempt information "would have resulted in disclosure of 'a meaningless set of words or phrases which have no or minimal information content'" sufficient).  The burden then shifts to plaintiff to "produce a

'quantum of evidence' to rebut th[e] presumption." *Am. Ctr. for L. & Justice v. U.S. Dep't of State*, 330 F. Supp. 3d 293, 306 (D.D.C. 2018) (quoting *Sussman*, 494 F.3d at 1117).  Plaintiff states that "the records at issue likely contain factual information that will remain both meaningful and informative, even if heavily redacted," Pl.'s Reply at 23 (emphasis omitted), but offers nothing beyond this speculation that might rebut the presumption.  VA has thus demonstrated that it complied with its segregability obligations, and the disputed records are properly withheld.

## IV.    CONCLUSION

For the foregoing reasons, VA's Motion for Summary Judgment is granted and plaintiff's Cross-Motion for Summary Judgment is denied.  VA has justified its withholdings of 451 full pages of the seven contested records and redactions from twenty-two of the thirty-eight released pages under Exemption 5's deliberative process privilege, shown that foreseeable harm would result from further disclosures, and complied with its segregability obligations.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  April 20, 2021

_____
BERYL A. HOWELL
Chief Judge